**Penny FRAZER, individually and on behalf of a plaintiffs' class of persons similarly situated, Plaintiff,**

v.

**CNA INSURANCE COMPANY, et al., Defendants.**

**No. CIVA7:02CV1684UWCPWG.**

United States District Court, N.D. Alabama, Western Division.

March 4, 2005.

Barry A. Ragsdale, Ivey & Ragsdale, Birmingham, AL, Brian P. Strength, Cochran Cherry Givens & Smith, Tuskegee, AL, Garve Ivey, Jr., Ivey & Ragsdale, Jasper, AL, for Plaintiff.

Michael McCluggage, Brent R. Austin, Rebecca Alfert, Wildman, Harrold, Allen & Dixon, LLP, Chicago, Il, Elizabeth McElroy, Baxley, Dillard, Dauphin & McKnight, Birmingham, AL, Jere F. White, Jr., Natasha L. Wilson, Wynn M. Shuford, Lightfoot Franklin & White LLC, Birmingham, AL, for Defendant.

## ORDER

CLEMON, Chief Judge.

On March 11, 2004, the United States Magistrate Judge, to whom the above-captioned civil action was assigned pursuant to the General Order of Reference, filed Findings and Recommendations in which it was recommended that the claims of Plaintiff Penny Frazer ("Frazer") be dismissed. (Doc. 18). Defendant Transcontinental Insurance Company (referred to in the complaint as CNA Insurance Company) had sought dismissal pursuant to the provisions of Rule 12(b)(6). (Doc. 8). Frazer

timely filed objections to the magistrate judge's findings and recommendation. (Doc. 19).

On June 28, 2004, following oral argument, this court entered an order which authorized the plaintiff to amend her complaint to cure the deficiencies identified by the magistrate judge in the findings and recommendation. On August 6, 2004, the plaintiff submitted what she styled as an "Amended and Recast Complaint." (Doc. 25.) Rather than clarifying or further illuminating her own claims in light of the magistrate judge's findings and recommendation, Frazer's Amended Complaint merely added new individual plaintiffs, defendants and identified a purported defendants' class.[1]

On December 21, 2004, Transcontinental Insurance Company (identified as CNA Insurance Company in the Complaint) renewed its motion to dismiss correctly observing that Frazer had failed to cure or even substantively address the magistrate judge's findings and conclusions, which found the Complaint as filed by Frazer was due to be dismissed.

After reviewing the findings and recommendation of the magistrate judge, the applicable law, and the submissions and responses of the parties, this court concludes that the magistrate judge's findings and recommendation of March 11, 2004, (Doc. 18), are neither clearly erroneous nor contrary to law. Moreover, after a *de novo* review of the Plaintiff's Complaint, her objections to the magistrate judge's findings and recommendation, the applicable law and the additional submissions of the parties, it is ORDERED that the objections be OVERRULED, the findings and recommendation be ADOPTED in its entirety and the claims of Penny Frazer be DISMISSED with prejudice.

## MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION

GREENE, Chief United States Magistrate Judge.

Ms. Penny Frazer initiated this civil action with a complaint filed in the Northern District of Alabama. (Document # 1). Although the complaint does not expressly say so, Ms. Frazer may have been injured on the job while employed by a person, entity or organization subject to the Worker's Compensation Laws of the State of Alabama. The complaint does not indicate the nature or extent of Ms. Frazer's injury or illness, her current medical condition, her age, whether she is disabled or currently employed. She does state that in May of 2002 she entered into a Settlement Agreement with the CNA Insurance Company to resolve a Worker's Compensation claim. Ms. Frazer does not allege that there is any possibility that she will ever require medical treatment of any kind in the future that is in any way related to the unidentified illness or injury that was the subject of her settlement. She does explain, however, that she entered into a settlement of her otherwise unspecified worker's compensation claim and that " . . . [A]s a part of which future medical benefits were waived upon payment of a sum of money, . . . ." (Document # 1, p. 3, ¶ 5). Ms. Frazer purports to bring her complaint on behalf of all persons " . . . who, during the class period, entered into settlement agreements of Worker's Compensation claims, as a part of which a lump sum of money was paid to terminate future

---

1. Whether this new aspect of the "Amended and Recast Complaint" is properly before the court is a matter for Judge Greene to determine. At a minimum in the event that Judge Greene determines that the amendment was timely or otherwise appropriate the clerk should be directed to assign the August 6, 2004, date of the Amended Complaint as the filing date and assign a 2004 civil action number.

medical payments, as a part of which, the defendants [a putative defendant's class] failed or refused to comply with Medicare Secondary Payer Statute . . . ." (Document # 1, p. 6). Ms. Frazer defines herself as ". . . an intended beneficiary of the Medicare program, and thus has standing to bring this action." (Complaint, p. 2, ¶ 1). Ms. Frazer asserts claims of breach of contract (count one),[1] "negligence and wantonness. . . about their compliance with the act, . . ." (count two), a violation of the Medicare Secondary Payer Act from which "[the plaintiff] has been personally injured and damaged and the Medicare Trust Fund has been diminished," (count three) and a claim of unjust enrichment in which plaintiff alleges that a failure or refusal to comply with "the Act" has unjustly enriched the defendants "by causing or allowing the Medicare Trust Fund to absorb and be responsible for the medical expenditures for which the [defendant] was otherwise liable" (count four).

CNA has filed a motion to dismiss the plaintiff's complaint on grounds that she has failed to state a cause of action upon which relief may be granted (Rule 12(b)(6)), and asserts that dismissal is an appropriate remedy for an alleged abridgment of Rule 8(a). (Document # 8). In the motion to dismiss the defendant argues that Ms. Frazer "lacks standing" to bring a cause of action, that she does not allege a violation of a legally recognized duty and that her claims of breach of contract, negligence and unjust enrichment are insufficient as a matter of law. The matter is before the undersigned judge pursuant to the provisions of 28 U.S.C. § 636(b); Rule 72(b) of the *Federal Rules of Civil Procedure;* LR 72.1; and the General Orders of Reference dated July 25, 1996, May 8, 1998, as amended July 27, 2000. After

consideration of the complaint, the motion to dismiss and the applicable law, defendant's motion to dismiss on Article III standing grounds is due to be GRANTED. The motion to dismiss on Rule 8 grounds is due to be DENIED.

### RULE 12(b)(6)

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When considering a motion to dismiss made pursuant to Rule 12(b)(6) the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. See, *SEC v. ESM Group, Inc.,* 835 F.2d 270, 272 (11th Cir.1988). Moreover, the liberal-pleading requirements of Rule 8 necessitates only that a complaint set forth the generalized statement of facts from which a defendant will be able to frame a responsive pleading. Thus, "[t]he threshold sufficiency of a complaint that a complaint must meet to survive a motion to dismiss is exceedingly." *Ancata v. Prison Health Serv., Inc.,* 769 F.2d 700, 703 (11th Cir.1985). When, however, no construction of the factual allegations made in the complaint will support a cause of action, dismissal of the complaint is appropriate. See, *Scelta v. Delicatessen Support Serv., Inc.,* 57 F.Supp.2d 1327, 1335 (M.D.Fla.1999).

### THE MEDICARE SECONDARY PAYER ACT

*The Act*

Prior to 1980, Medicare generally paid for medical services whether or not the

---

1. Ms. Frazer does not identify the contract nor the parties to the contract allegedly breached.

recipient was also covered by another health plan.[2] See Social Security Amendments of 1965, Pub.L. No. 89–97, § 1862(b), 79 Stat. 286. However, beginning in 1980, Congress enacted a series of cost cutting amendments to the Medicare program. These amendments are collectively known as the Medicare Secondary Payer ("MSP") statute or the MSP provisions. See *New York Life Ins. Co. v. United States*, 190 F.3d 1372, 1374 (Fed. Cir.1999). These amendments have been codified at 42 U.S.C. § 1395y(b).[3]

The MSP statute was designed to curb skyrocketing health costs and preserve the fiscal integrity of the Medicare system. See *Zinman v. Shalala*, 67 F.3d 841, 845 (9th Cir.1995); H.R.Rep. No. 96–1167, at 352 (1980). The MSP attempted to lower over all federal Medicare disbursements by requiring Medicare beneficiaries to exhaust all available insurance coverage before looking to Medicare's coverage. *United States v. Rhode Island Insurers' Insolvency Fund*, 80 F.3d 616, 618 (1st Cir.1996). The MSP assigns primary responsibility for medical bills of Medicare recipients to private health plans when a Medicare recipient is also covered by private insurance. These private plans are therefore considered "primary" under the MSP and Medicare acts as the "secondary" payer responsible only for paying amounts not covered by the primary plan. *Blue Cross & Blue Shield of Texas v. Shalala*, 995 F.2d 70, 73 (5th Cir.1993).

Congress established two principal directives to achieve this objective. First, the MSP bars Medicare payments where "payment has already been made or can reasonably be expected to be made promptly (as determined in accordance with regulations)" by a primary plan. 42 U.S.C. § 1395y(b)(2)(A) (parenthetical in original). "Prompt" payment defined as payment made within 120 days of either the days of either the date on which the care was provided or when the claim was filed with the insurer, which ever is earlier. See, 42 C.F.R. § § 411.21, 411.50. The MSP defines a "primary plan" as "a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan), or no fault insurance ... [ ]." 42 U.S.C. § 1395y(b)(2)(A)(ii)(parenthetical in original). This provision "is intended to keep the government from paying a medical bill where it is clear an insurance company will pay instead." *Evanston Hospital v. Hauck*, 1 F.3d 540, 544 (7th Cir.1993).

Second, the MSP provides that when Medicare does make a payment for which a primary plan was responsible, the payment is merely conditional and Medicare is entitled to reimbursement. 42 U.S.C. § 1395y(b)(2)(B); *Blue Cross & Blue Shield of Texas v. Shalala*, 995 F.2d at 73. Section 1395y(b)(2)(B) provides in part:

> Any payment under this subchapter with respect to any item or service to which subparagraph (A) applies shall be

**2.** The Medicare program encompasses four basic groups: (1) Persons who have reached age 65 and are entitled to receive either Social Security, widows or Railroad Retirement benefits; (2) Disabled persons of any age who have received Social Security, widows or Railroad disability benefits for 25 months; (3) Persons with end-stage renal disease ("ESRD") who require dialysis treatment or a kidney transplant; and (4) Persons over age 65 who are not eligible for either Social Security or Railroad Retirement Benefits who pur-

chase Medicare coverage by payment of a monthly payment. The "working aged" are those Medicare beneficiaries who are also active employees working for an employer of 20 or more employees, 42 C.F.R. § § 405.340–341. See *Cooper v. Blue Cross and Blue Shield*, 19 F.3d 562 (11th Cir.1994).

**3.** As correctly noted by the plaintiff the MSP is not an Act in the traditional sense but, rather, a series of amendments related to the Medicare Act and similar statutes.

conditioned upon reimbursement to the appropriate trust fund established by this subchapter when notice or other information is received that payment for such item or service has been or could have been made under such subparagraph.

42 U.S.C. § 1395y(b)(2)(B)(1).

Medicare payments are subject to reimbursement to the appropriate Medicare trust fund once the government receives notice that a third-party payment has been or could be made with respect to the same item or service.[4] *Id.*

Title 42 U.S.C. § 1395y(b)(2)(B) provides:

(B) **Conditional payments.**

\* \* \* \* \* \*

(ii) **Action by United States.**

In order to recover payment under this subchapter for such an item or service, the United States may bring an action against any entity which is required or responsible under this subsection to pay with respect to such an item or service (or any portion thereof) under a primary plan (and may, in accordance with paragraph (3)(A) collect double damages against that entity), or against any other entity (including any physician or provider) that has received payment from that entity with respect to the item or

service and may join or intervene in any action related to the events that gave rise to the need for the item or service.

42 U.S.C. § 1395y(b)(3)(A) provides as follows:

(3) **Enforcement**

(A) **Private cause of action.**

There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for a primary payment (or appropriate reimbursement) in accordance with such paragraphs (1) and (2)(A).[5]

The cause of action arises under paragraphs (1) and (2)(A) of 42 U.S.C. § 1395y(b)(1) which defines a group health plan and § (2)(A) which includes "... a group health plan, to the extent that clause (i) applies and a *workmen's compensation law or plan*, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies". Section 2(A)(ii) establishes that Medicare will not pay for any item or service for which payment has been made or can reasonably be expected to be made promptly under a workmen's compensation law.

---

4. If MSP reimbursement is not made, the MSP authorizes the government to bring an action against "any entity which is required or responsible ... to make payment ... under a primary plan" and against "any other entity (including a physician or provider) that has received payment from that entity." 42 U.S.C. § 1395y(b)(2)(B)(ii). The MSP also gives the government a separate right of subrogation. 42 U.S.C. § 1395y(b)(2)(iii).

5. Ms. Frazer places a particular emphasis on the phrase "...which fails *to provide* for a primary payment..." in her contention that she has stated a cognizable cause of action.

(Emphasis added). For reasons more fully set forth below her analysis does not sustain her claim. It is also significant that the statute encompasses at least two distinct classes of primary payers. The statute is not limited to worker's compensation issues. Paragraph (1) includes group health plans which must provide for medical expenses and for plans which include active disabled participants. These groups and plans are more like to come within the "provide for" language than a worker's compensation settlement agreement. Paragraph 2(A) deals with the total settlement and of worker's compensation issues.

## The regulations

The MSP precludes Medicare from providing payment for services to the extent that the payment in question has been made or can reasonably be expected to be made promptly under the applicable workmen's compensation act. This exclusion is also embodied in the Code of Federal Regulations which specifically embraces workmen's compensation as payment subject to reimbursement to Medicare, 42 C.F.R. § 411–20 provides:

Section 411–20 basis and scope.

(a) **Statutory basis.**

 * * * * * *

(2) Section 1862(b)(2)(A)(ii) of the Act precludes Medicare payment for services to the extent that payment has been made or can reasonably be expected to be made promptly under . . .;

(i) Worker's compensation.

The Central Office of the Centers for Medicare and Medicaid Services (CMS), as authorized by Congress has promulgated regulations specifically intended to carry out the mandate of the MSP amendments.[6] For example, 42 C.F.R. 411.24 establishes procedure for recovery of erroneous payments. 42 C.F.R. 411.25 imposes a requirement upon insurers to notify CMS when it has been mistakenly compensated for expenses and 42 C.F.R. 411.32 establishes the rules governing Medicare as a secondary payer.

CMS regulations as interpreted by the courts offer a wide variety of options through which Medicare can pursue reimbursement. 42 C.F.R. 411.24(g) provides, for example:

CMS has a right of action to recovery its payments from any entity, including a beneficiary, provider, physician, attorney, state agency or private insurer that has received a third-party payment.

A beneficiary is required to cooperate CMS to recover conditional payments. If CMS is unsuccessful in its recovery action, as a result of the failure of a beneficiary to cooperate, CMS may then recover the conditional payment directly from a beneficiary. 42 C.F.R. 41123 ( . . . "(b) if CMS's recovery action is unsuccessful because the beneficiary does not cooperate CMS may recover from the beneficiary.")

While the MSP is applicable to both worker's compensation and personal injury tort claims settlements there is a difference in the manner in which each is considered by CMS. In the workers compensation context the obligation for the payment of medical expenses which may occur in the future arises from the worker's compensation statute of the state rather than as a product of the settlement agreement itself. Under Alabama law for example, an employer is obligated to pay " . . . reasonably necessary medical and surgical treatment and attention, physical rehabilitation, medicine, medical and surgical supplies, crutches, artificial members and other apparatus as a result of an accident arising out of and during the course of employment as may be obtained by the injured employee. . . ." Title 25–5–77, *Code of Alabama* (1975).[7] When a disability under the workmen's compensation statutes has been determined it carries with it as a matter of law that the employer must provide for payment of all future medical expenses that may be rea-

---

**6.** CMS was formerly known as the Health Care Financing Administration (HCFA).

**7.** The worker's compensation aspect of the MSP differs in another fundamental way. When a primary health insurance plan covers

all of a participant's medical expenses Medicare is secondary in all cases. In the worker's compensation case the obligation is to pay only reasonable expenses for specific services the need for which generally arises from a single event or illness.

sonable and necessary for the treatment of the injury. *Conley v. SCI Systems, Inc.*, 495 So.2d 698 (Ala.Civ.App.1986).[8]

At subpart (c) of part 411 the regulations address "limitations on Medicare payments for services covered under worker's compensation." Relevant to the present inquiry is 42 C.F.R. 411.46 which provides

**Lump sum payment.**

(a) Lump-sum *commutation* of future benefits. If a lump-sum compensation award stipulates that the amount paid is intended to compensate the individual for all future medical expenses required because of the work related injury or disease, Medicare payments for such services are excluded until medical expenses related to the injury or disease equal the amount of the lump-sum payment. (emphasis added).

(b) Lump-sum compromise settlement.

(1) A lump-sum compromise settlement is deemed to be a worker's compensation payment for Medicare purposes even if the settlement agreement stipulates there is no liability under the worker's compensation law or plan.

(2) If a settlement appears to represent an attempt to shift to Medicare the responsibility for payment of medical expenses for the treatment of a work related condition, the settlement will not be recognized. For example, if the parties to a settlement attempt to maximize the amount of the disability benefits paid under worker's compensation by releasing the worker's compensation carrier and liability for medical expenses for a *particular* condition even though the facts show that the condition is work-related, Medi-

care will not pay for treatment of that condition.

\* \* \* \* \* \*

(d) Lump-sum compromise settlement: effect on payment for services furnished after the date of settlement-

(1) Basic rule. Except as specified in paragraph (d)(2) of this section, if a lump-sum compromise settlement *forecloses* the possibility of future payments of worker's compensation benefits, medical expenses incurred after the date of the settlement are payable under Medicare. (emphasis added).

(2) Exception. If the settlement agreement allocates certain amounts for specific future medical services, Medicare does not pay for those services until medical expenses related to the injury or disease equal the amount of the lump-sum settlement allocated to future medical expenses.

Worker's compensation settlement agreements come within the ambit of the regulations in only one of two ways. First, in a case in which the parties consider only compensation for future medical expenses and agree upon a lump sum settlement which forecloses future payments beyond the settlement sum. This "commutation" of future medical benefits is generally reached when a worker's compensation claimant is receiving social security or disability benefits at the time of the settlement. Under the regulations, Medicare will pay for covered medical services only after the exhaustion of the lump sum amount of the agreement. When a lump sum settlement agreement includes both an income replacement component and a provision for future medical expenses, the parties are required to adequately consid-

---

**8.** Clearly a worker's compensation statute does not require the payment of all future medical expenses but only those directly relat-ed to the injury or illness arising in the course of employment.

er the interests of Medicare. Such a compromise settlement will also foreclose future worker's compensation payments and Medicare will begin to pay when the allocated amount has been exhausted.[9] An agreement which allocates a portion of the lump sum to medical expenses will "disregarded" only where it is clear that the parties have attempted to unlawfully shift medical expenses covered under the worker's compensation statutes to Medicare. An agreement which does not specifically make an allocation or devote a portion of the lump sum to medical expenses can be analyzed under a regulatory matrix which determines what portion of the unspecified settlement should be allocated to future medical expenses. The regulations do not require a formal set aside or trust be created. An individual claimant receiving a lump sum settlement which includes a future medical care component is obligated to exhaust those funds before Medicare can be made responsible for medical payments.

Ms. Frazer's complaint is vague as to what her agreement with the worker's compensation carrier might have been. She states that her "... future medical benefits were *waived* upon a payment of a sum of money...." This language suggests that a portion of her settlement was allocated to future medical expenses, a practice clearly permissible under the regulations and the statute. It would also appear that her agreement is within the ambit of 42 C.F.R. § 411.46(d). The putative class is described as those persons who have received a lump sum of money "... to *terminate* future medical payments." The class description more closely resembles an agreement to which § 411.46(a) is applicable.[10]

*The Patel memo* [11]

Ms. Frazer has submitted in her opposition to the motion to dismiss the July 23, 2001 letter from CMS. The transmittal clarifies CMS's policy regarding Medicare and worker's compensation settlements.[12] In the document, CMS distinguishes between those cases which may require prior CMS approval and those that do not. As noted above the CMS defines "commutations" as a worker's compensation settlement that is intended to compensate the claimant for future medical expenses. "Compromise settlements" are intended to compensate the claimant for current or past medical expenses. Medicare clearly has an interest in settlements which involve future medical expenses *and* the claimant is currently eligible for Medicare benefits. A settlement is considered a commutation regardless of whether the parties admit or deny liability. A "set-aside" arrangement or allocation is applicable only to a commutation. In most cases in which a worker's compensation claimant is not eligible for Medicare, even a commutation settlement need not be reviewed by CMS. If, however, the claimant is not eligible for Medicare but will *become* eligible for Medicare within thirty months of the settlement *and* the total settlement including attorneys fees and indemnity ex-

9. In her brief Ms. Frazer argues that "... the closing of future medical expenses serves to reduce the worker's compensation insurer's responsibility as 'primary payer' and shift that responsibility to Medicare ...." Clearly the regulations do not foreclose that result.

10. § 411.46(b)(2) is also within the class description. The regulation includes not only future medical expenses but a compromise with respect to expenses already incurred.

11. Memorandum from Parsbar B. Patel, Deputy Director, Purchasing Policy Group, Center for Medicare Management.

12. Whether the letter is properly before the court in its present form may be questionable. The letter is considered, however, in the context of the Article III standing question addressed below.

ceeds $250,000, the case must be submitted under the CMS policy letter.[13] The threshold issue under the Patel memorandum is whether the claimant will be eligible for Medicare benefits within thirty months of disability or industrial illness. The regulations and transmittal letter promulgated by CMS clearly establish that third-party payers and Medicare beneficiaries are required to consider Medicare's interests only when the injured individual has a reasonable expectation of enrollment within thirty months of the settlement date and the anticipated total settlement for the future medical expenses *and* lost wages over the life or duration of the settlement agreement is expected to be greater than $250,000. (Patel memorandum). The $250,000 threshold is determined by the amount of the settlement allocated to future medical expenses and "lost wages" not merely the amount attributed to future medical expenses. After the July 23, 2001 transmittal letter it is the policy of CMS that formal review of future medical benefit "set-asides" may be required only when the factors enumerated above are present. There is simply no rule, regulation or statute which requires a worker's compensation settlement agreement to consider Medicare's interests in all cases. Ms. Frazer does not allege that she is now or will ever become eligible for Medicare nor that her settlement was in the amount of $250,000 or greater.

### THE MOTION TO DISMISS

*Standing*

The defendant alleges that Ms. Frazer has failed to state a claim upon which relief can be granted in part because she lacked standing to bring this action in her own right and on behalf of the putative class. The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citing *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953)). To satisfy the "case" or "controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 2136–2137, 119 L.Ed.2d 351 (1992); *Valley Forge Christian College v. American's United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–472, 102 S.Ct. 752, 757–759, 70 L.Ed.2d 700 (1982). In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Id.* at 474–475, 102 S.Ct. at 760. Like their constitutional counterparts, these "judicially self-imposed limits on the exercise of federal jurisdiction," *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), are "founded in concern about the proper-and properly limited-role of the courts in a democratic society," *Warth, supra,* 498, 95 S.Ct. at 2205; but unlike their constitutional counterparts, they can be modified or abrogated by Congress, see 422 U.S. at 501, 95 S.Ct. at 2206.

With respect to the requirement that the plaintiff suffer a cognizable injury at least three pre-requisites must be satisfied in order that a plaintiff has standing to bring an action. First, the plaintiff must have suffered an injury in fact that is an invasion of a judicially cognizably interest

---

**13.** There is a different rule for claimants who are already receiving Medicare benefits. In such a case, a "set-aside" is applicable to smaller lump-sum settlements.

which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second there must be a causal connection between that injury and the conduct complained of. That is the injury itself must be fairly traceable to the challenged action of the defendant and not the result of the independent action of a third party. Finally, it must be likely, not merely speculative, that the injury can be redressed by a favorable decision returned by court. *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997). These elements "constitute [ ] the core of Article III's case-or-controversy requirement." *Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 103–104, 118 S.Ct. 1003, 1017, 140 L.Ed.2d 210 (1998). At the pleading stage. "general factual allegations of injury resulting from defendant's conduct may suffice, for on a motion to dismiss will presume that the allegations embrace those specific facts necessary to support the claim." *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2137. The plaintiff must, however, allege facts from which it can be seen that she is entitled to relief. A court may not simply explore the universe of factual assertions which might be made by someone and contends the plaintiff intended to allege those facts in her complaint.

Ms. Frazer asserts three basic arguments in her opposition to the motion to dismiss. First, she contends that her complaint is in some fashion predicated upon the private cause of action created by the 1984 amendments to the MSP. Second, she

contends that because she maybe subject to a "disregard" of her worker's compensation settlement she has the possibility of incurring an injury in the future. Third, she contends that she may proceed as a "private attorney general" and is not required to establish that she has or will incur a personal injury from the alleged conduct of the defendant.

*The private cause of action*

To encourage timely payment of covered medical expenses, Congress authorized a private cause of action and double damages against primary payers when covered expenses are paid for by Medicare. See 42 U.S.C. § 1395(b)(3)(A). The statute provides the government with both an independent right of action and a subrogation right to a private citizen's recover of such funds. See 42 U.S.C. § 1395y(b)(2)(B)(ii)-(iii).

The legislation's incentive to bring a private law suit is clearly based in turn upon the subrogation right of the government to obtain a portion of the recovery. This recovery of costs by Medicare is the primary purpose of the MSP.[14] The statute provides that a private litigant who recovers a reimbursement for claims paid by Medicare and which have been denied by an insured defendant is required to turn over the amounts of such claim to the government. See 42 U.S.C. § 1395y(b)(2)(ii)(providing action by the United States to recovery from "any other entity" that has received payment from the

---

**14.** "Neither the statute nor the Conference report specifically explains Congress's intent in adding the private right of action to the MSP. However, when Senator David Durenberger, Republican of Minnesota, introduced President Reagan's Medicare proposals for 1986, which included adding a private right of action to enforce the MSP, it was introduced as the President's 'health care cost reduction proposals.' *See* Statements of In-

troduced Bills & Joint Resolutions, 132 Cong. Rec. S. 11930–01 (Statement of Sen. Durenberger) (August 15, 1986) (page references unavailable). This statement supports the intent we glean from the language of the statute-to save the government money by giving private citizens incentives to recover funds erroneously paid by Medicare." *Manning*, 254 F.3d at 395 n. 8.

primary plan responsible for payments under the MSP laws).

■ As a preliminary matter it must be recognized that since the inception of the MSP there is not a single reported case in which the theory expressed by Ms. Frazer has been pled or adjudicated. Neither has the 2001 Patel memorandum established such a cause of action in any court. There is no authority from any court which has held that 42 U.S.C. § 1395y(b)(3)(A) authorizes a worker's compensation claimant who has never been required to pay for medical care arising from an industrial accident, who has never had a claim denied by the carrier, who is not alleged to be a recipient of Medicare benefits or eligible for such benefits within thirty months to assert a cause of action for "double damages" allegedly arising from a failure to "... provide for payment ..." of a medical expense which might be incurred at some unspecified future date. Indeed, all reported cases addressing the question have presumed that such a cause of action and the relief afforded by the statute arises only when a discrete claim has accrued and will be paid or has been paid by Medicare. The consensus of reported cases is that "a private cause of action and double damages against entities designated as primary payers that fail to pay for medical costs for which they are responsible, *which are borne in fact by Medicare*". *Manning v. Utilities Mutual Insurance Company, Inc.,* 254 F.3d 387, 391 (2d Cir.2001). (Emphasis added). See also *Manning v. Utilities Mutual Insurance Company, Inc.,* 2004 WL 235256 (S.D.N.Y.2004) (Recognizing the right of a private citizen to bring an action under the section where there is evidence of specific medical treatment which has been paid by Medicare.) See e.g., *Perry v. United Food and Commercial Worker's District Unions,* 64 F.3d 238 (6th Cir.1995), cited in *Harris Corporation v. Humana Health Insurance Company of Florida, Inc.,* 253 F.3d 598, 603, 605 (11th Cir.2001).

In the motion to dismiss and in Ms. Frazer's reply the parties cite to the Second Circuit's decision of the MSP in *Manning v. Utilities Mutual Insurance Company, Inc., supra.* In *Manning* the court addressed an issue unrelated to the viability of the private cause of action; however, the court considered the contours of 42 U.S.C. § 1395y(b)(3)(A). The *Manning* plaintiff had been injured in 1962 and when his tort recovery award was depleted in 1968 the worker's compensation carrier of his employer refused to pay for services that unequivocally related directly to the 1962 injury. In 1997 the parties settled a state lawsuit with the plaintiff preserving his right to pursue any recovery under the MSP after Medicare had paid for medical expenses related to Manning's 1962 injury. Significantly Manning, a quadriplegic following his accident, received social security disability benefits from 1962 forward. As noted earlier the Second Circuit observed that the cause of action under the MSP exists to recoup medical expenses paid by Medicare and the private party is rewarded for initiating the action by collecting an amount roughly equal to the improper payment that was received. That is, Medicare obtains its reimbursement and the private citizen initiating the lawsuit can individually recover a like amount. Following the Second Circuit's remand, the district court in *Manning* found unrebutted evidence that the medical care expenses assumed by Medicare from 1962 were directly attributable to the industrial injury which led to both the worker's compensation liability and the Medicare disability status of the plaintiff. See *Manning v. Utilities Mutual Insurance Company, Inc.,* 2004 WL 235256 (S.D.N.Y.2004). *Manning* serves to make clear that the private cause of action is a medical recoupment provision. Nothing in *Manning* suggests a liability

exists for "double damages" for an unliquidated, inchoate future medical expense.

The defendant relies to some extent on an analysis of Article III standing by the Third Circuit in *Wheeler v. Travelers Insurance Company*, 22 F.3d 534 (3rd Cir. 1994). In *Wheeler* the Third Circuit concluded that a plaintiff in a diversity action lacked the constitutional minima to bring a law suit which merely sought to benefit a third party. The question turned upon the fact that a state statute upon which the plaintiff bought her claim would not permit recovery beyond the actual medical expenses paid. This led the Third Circuit to conclude that because plaintiff would have been obligated to remit any recovery to Medicare she "... never ... [ ] ... had anything to gain from [the] lawsuit." *Wheeler*, 22 F.3d at 538.

Ms. Frazer notes that in *Brooks v. Blue Cross and Blue Shield of Florida*, 1995 WL 931702 (S.D.Fla.1995) the district court distinguished the *Wheeler* conclusion with respect to standing in a MSP action invoking 42 U.S.C. § 1395y(b)(3)(A). The *Brooks* court did indeed note that because the MSP provided for a recovery to the benefit of Medicare and the plaintiff, a possibility which was foreclosed in *Wheeler*, the plaintiff "... who [has] not suffered an injury *in that they have been covered by Medicare* for medical care that they have *received* retain a sufficient interest in this action for the purposes of the constitutional 'case or controversy' requirement." *Id.* at *11. (Emphasis added). The district court also speculated that a "individual plaintiff [who] [is] *currently* subject to hav-

ing their claims rejected by Medicare on the grounds that the MSP laws make some other insurer primary ... may face the realistic possibility [that his] claim will *continue* to be unpaid, and health care providers may seek payment from them individually." (Emphasis added). First, *Brooks* stands for the unassailable proposition that before double damages for the failure to pay a medical claim there must indeed be such a claim. *Brooks* does not hold that a plaintiff alleging no injury or disability nor eligibility for Medicare can maintain a cause of action for an unspecified future medical expenditure which may or not occur in the future.[15]

In *Harris v. Humana Health Insurance Company of America*, 253 F.3d 598 (11th Cir.2001) the Eleventh Circuit noted in a factually distinct context that the private cause of action is implicated "when a primary payer does not pay benefits in accordance with the MSP statute provisions...." *Id.* at 605. Ms. Frazer argues that the statute required that a medical expense be either paid for or "provided for" implying that the language of the statute creates two distinct concepts. In fact, neither the statute nor the Patel memorandum support such a conclusion. The statute envisions that a payment has been made or will be made within a reasonable period of time. The regulations also call for an insurer to establish a process by which such claims are submitted by a beneficiary or a third-party provider and render a coverage decision and pay an appropriate claim. A health care provider

---

**15.** The district court's speculation with respect to a private action by a health care provider against an individual claimant ignores the obligation of Medicare to make a conditional payment subject to reimbursement from the employer or the insurance carrier. As set out above, the regulations do not provide for an action by CMS against the individual beneficiary. The regulations do provide for payment to be made by Medicare subject to its right to seek reimbursement. CMS regulations require health care providers to determine the insurance carrier and Medicare eligibility, then submit the claim to the appropriate payer. If a vendor brings an action against an individual who is eligible for Medicare and the claims can be paid by Medicare the claimant can then initiate a lawsuit.

is a vendor directed by regulation to ask patients a series of questions designed to elicit whether Medicare or a private insurer is the primary payer. If the provider determines that a private insurer should pay as a primary, the provider will submit the claim to the private insurer. The private insurer is in turn obligated to make an independent determination regarding their obligation to pay the claim. The regulations do not specify the precise nature of the system to be used by the private insurer, however, the obligation to assess such claims is a matter of regulation. Because Medicare may make a conditional payment the phrase "provided for" clearly refers not to a discrete "set aside" or an allocation for future medical expenses but, rather, refers to the system by which an insurer is obligated to establish a process under which medical expenses will be paid. The phrase "fails to provide for" merely reflects the realities of the third-party payment process and does not impose a separate category for recovery.[16] The provisions of the private cause of action under the MSP simply do not apply to Ms. Frazer's complaint. The statute clearly requires that Medicare make a payment whether initially or conditionally for which a private insurer was obligated as the primary payer and a plaintiff may initiate a lawsuit to recover that expense and receive a bounty for doing so.

*The disregarded settlement*

■ Ms. Frazer argues that because Medicare can "disregard" a worker's compensation settlement under certain circumstances she is at risk of some future harm. As discussed earlier, however, the disregard merely operates to permit CMS to pursue payment for medical expenses incurred by Medicare from the insurer or the employer and then only when it is due when it is clear that the parties to the agreement have intentionally shifted responsibility for known future medical expenses to Medicare. A disregarded settlement does not result in a denial of medical treatment to the insured worker receiving Medicare benefits. The regulation and statutes authorize Medicare to make such payments and to make such payments and to seek reimbursement from the employer on the carrier.[17]

Assuming that Ms. Frazer contends that she may be required herself to pay for a medical procedure from the proceeds of her settlement it is apparent that such an eventuality is not a disregard but rather is consistent with the regulatory requirements that funds which constitute an allocation for future medical expenses be exhausted before Medicare assumes responsibility for payment. Ms. Frazer simply does not allege that she is at risk for the denial of medical care nor that Medi-

16. Under Ms. Frazer's formulation a settlement could "fail" to "provide for" payment by failing so reserve a specific fund with which to pay a claim or establish a review process but the carrier actually pays for a covered service. According to Ms. Frazer the carrier will nonetheless be in violation of the statute because a "failure" to establish a set aside *or* a failure to pay constitutes separate violations of the statute. The first "failure to provide for" under Ms. Frazer's formulation would occur when the settlement itself was reached and all possible elements of the cause of action would be satisfied at that time even though a claim was in fact later paid by the

insurer. This example, of course, further demonstrates the unworkability of the notion that a cause of action for "double damages" can proceed to trial without once ever identifying the medical expenditure or amount to be doubled.

17. Moreover, when a service has been provided and Medicare has assumed responsibility for the payment the worker can the pursue a private cause of action to recover double that cost. The cause of action arises with the denial and the subsequent payment by Medicare.

care will seek to recover costs beyond the amount allocated for such expenses from her individually.

*Private attorney general/qui tam*

 In support of her contention that she may bring this action as a private attorney general or a proceeding analogous to a *qui tam* action, Ms. Frazer blurs the analytical distinctions between two separate legal concepts. First, it bears repeating that Ms. Frazer has alleged no facts under which she may pursue this litigation under the MSP statutory private cause of action. "If a litigant is an appropriate party to invoke the power of the courts, it is said that he has a 'cause of action' under the statute.... [The] concept ... is employed specifically to determine who may judicially enforce the statutory rights or obligations." *See Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264 2274, 60 L.Ed.2d 846 (1979). When such a potential plaintiff is outside of that class of persons the plaintiff lacks standing. The statute does not create an additional remedy for a private litigant. "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19–20, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979). Ms. Frazer relies upon the existence of the very statutory provision she does not satisfy when she asserts that because Congress has provided for a specific cause of action she is not required to meet the "zone of interest" analysis despite the fact that Congress specifically did not authorize a broader private remedy.

Ms. Frazer premises her view of "private attorneys general" in part on *dicta* in two district court cases. First, in *Man-*

*ning, supra,* as noted above the district court observed unremarkably, that an individual could sue to "right an economic wrong done to the government.... [T]he ... MSP allows for multiple damages to enable the government to *recover* its funds while providing a financial incentive for private citizens to bring such lawsuits .... [The] statute [ ] also creates 'private attorneys general, by authorizing private citizens to recovery part of the recovery.' " (Emphasis added). *Manning*, 254 F.3d at 394 (cited at p. 17 of plaintiff's Response in Opposition to the Motion to Dismiss). Nothing in the cited case stands for the proposition that a private attorney general is to be distinguished from a plaintiff authorized by the terms of the statute to recover erroneous payments made by Medicare. The phrase "private attorneys general" as used in *Manning* does not negate the requirement that an actual injury to Medicare by reason of an overpayment or erroneous payment made by the government. Likewise, in *Mason v. American Tobacco*, 212 F.Supp.2d 88 (E.D.N.Y.2002) cited by Ms. Frazer, the basis of the district court's comparison of an MSP private cause of action to a *qui tam* or private attorney general lawsuit was expressly bottomed upon the plaintiff's satisfaction of provisions of the statute giving rise to the private cause of action. The existence of one private cause of action does nothing to exempt a plaintiff from satisfying the requirements of Article III standing when the complaint is not based upon that provision.[18] Ms. Frazer relies on a more generalized private cause of action when she alleges that she satisfies the "zone of interest" as a beneficiary of the MSPA statute. This statute does not confer a benefit upon Ms. Frazer. The statute is intended to assist Medicare to

---

**18.** Arguably, the legislative decision to create a private cause of action and define the circumstances under which such an action may be brought may well serve as evidence that Congress did not intend to permit an action not based expressly on that statute.

obtain reimbursements for payments unlawfully made. The intended beneficiaries of the statute are Medicare and the federal treasury, not Ms. Frazer. An individual has an economic interest under the MSP only when he or she is able to obtain a recovery and benefit from the bounty afforded by the statute for that effort.[19] Ms. Frazer contends that she has standing because she has "alleged that the defendants have violated the MSPA." (Document #.14 at p. 16). Ms. Frazer argues that the Supreme Court's holding in *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) expands the "zone of interest" with respect to standing supports her contention that she may bring this action as a "private attorney general." She also implies that the express cause of action or the Endangered Species Act at issue in *Bennett* is analogous to that of the MSP. It simply is not. The Supreme Court has held that to qualify as a person "adversely effected or aggrieved... within the meaning of a statute, a plaintiff must establish the injury he complains of ... falls within the 'zone of interest' sought to be protected by the statutory provision whose violation forms the legal basis of his complaint." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) [quoting *Clarke v. Securities Industry Assoc.*, 479 U.S. 388, 396–97, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987).] The Supreme Court held that a qualified plaintiff in a regulation case includes not only those who themselves are subject to the contested regulatory action but those whose interests are not so "marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

In *Bennett* the Endangered Species Act authorizes "any person" aggrieved by a governmental agency to bring a lawsuit to challenge the decision of a government agency. In *Bennett* the Supreme Court merely observed that the expansive nature of the congressionally provided right to sue negated the zone of interest test or in the words of the Supreme Court "more accurately, expanded the zone of interest." *Bennett*, 520 U.S. at 163, 117 S.Ct. 1154. It was the expansive nature of the authorization to sue not a decision of the Supreme Court to re-write the zone of interest test that led to a finding of Article III standing. The Endangered Species Act authorized "any person [to] commence a civil suit" to challenge a decision of a governmental agency. Significantly the relevant zone of interest identified is the right of the individual to be free from a governmental action which has an offect upon that individual as opposed to an implicit

---

19. While Ms. Frazer does not herself make the claim that she proceeds under the *qui tam* statutes, there is a reference to a *qui tam* in the quotation cited from Judge Weinstein's opinion in *Mason v. American Tobacco Company* which refers to an MSP action "similar" to a *qui tam* action. A *qui tam* action is distinct from what is presented in Ms. Frazer's complaint. Generally *qui tam* actions arise under federal statutes, for example the false claims act, which authorizes both the United States Attorney General and private persons with knowledge of fraud against the government to bring a civil action as a "relator" acting on behalf of the United States government, and to share in proceeds for his or her efforts. See, e.g. 31 U.S.C. § 3730(b); *Hughes Aircraft Company v. U.S. ex rel. Schumer*, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). The government may recover treble damages for fraud committed against the government should it choose to intervene and simultaneously award the relator no less than fifteen and no more twenty-five percent of the bounty. In the even the government chooses not to take action the relator "shall have the right to conduct the action" and receive twenty-five to thirty-five percent of the moneys. 31 U.S.C. § 3730(b)(4)(B)-(d)(2) (1994). Ms. Frazer does not appear to suggest that her cause of action is truly a "*qui tam*."

authority for an individual to initiate a law suit expressly intended to benefit the government. The private cause of action of the MSP limits the circumstances under which an action can be pursued whereas the cause of action in the ESA expanded its scope the full extent of Article III. It was the expression of Congress to create a broader class of persons empowered to bring a law suit which distinguishes *Bennett* from other "zone of interest" discussions. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 1519, 149 L.Ed.2d 517, —— (2001). Nothing in the MSP brings the plaintiff individually within the scope of the statute independent of the narrowly defined cause of action provided by Congress.

■ A *qui tam* plaintiff or a private attorney general must satisfy Article III standing requirements in order to bring a suit in federal court. Ms. Frazer has not alleged that she has been injured nor even that she faces the prospect of injury. "The jurisdiction of the federal court is defined by Article III of the Constitution" and is limited to "cases" and "controversies." *Flast v. Cohen,* 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). The law of Article III standing is built upon separation of powers. *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). This standing requirement avoids "convert[ing] the judicial process into 'no more than a vehi-

cle for vindication of the value interests of concerned bystanders.'" *Valley Forge Christian College v. Americans United For Separation of Church & State, Inc.,* 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982) (quoting *United States v. SCRAP,* 412 U.S. 669, 667, 93 S.Ct. 2405, 2415–16, 37 L.Ed.2d 254 (1973)). The "injury-in-fact" test requires a plaintiff to demonstrate more than an injury to a cognizable governmental interest. "It requires the party seeking review to be himself among the injured." *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1972). That injury must be concrete. *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 209, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Ms. Frazer simply does not allege facts which demonstrate that she is within the zone of interest of the MSPA.[20]

## CONCLUSION

The statute upon which Ms. Frazer brings her complaint will not sustain the claim because (1) she has no standing under Article III, (2) the MSPA does not create a cause of action which would permit a non-Medicare eligible worker's compensation claimant to bring such an action and (3) the statute does not impose an obligation enforceable by a private citizen for CMS review of all worker's compensation settlements and (4) Ms. Frazer does not allege that she or the class she purports to represent will ever fall within the

---

**20.** Moreover, the defendant is correct in its assertion that the MSPA does not appear to impose the legal duty Ms. Frazer contends is the basis for her complaint. As the Patel memorandum and the enabling regulations made clear there is simply no requirement that all worker's compensation settlement agreement outside the confines of the Patel memorandum must be submitted to CMS. Moreover, the defendant is also correct that

plaintiff has offered no evidence that the Patel memorandum, the regulations or the act itself create such an obligation. This does not mean, of course, that CMS is powerless to enforces its policy preferences on a recalcitrant worker's compensation insurer. It may do so in any number of ways. The Patel memorandum, however, does not appear to create a discrete legal obligation enforceable by a third party.

ambit of the private cause of action Congress has provided.

It is RECOMMENDED that the motion to dismiss is due to be GRANTED.

The parties are DIRECTED to Rule 72(b), *Federal Rules of Civil Procedure.*