# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Marriage of Washkowiak*, 2012 IL App (3d) 110174

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF CHRISTOPHER WASHKOWIAK, Petitioner-Appellant, and ROSANA WASHKOWIAK, Respondent-Appellee. |
| District & No. | Third District<br>Docket No. 3-11-0174 |
| Filed | March 7, 2012 |
| Rehearing denied | April 10, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In marriage dissolution proceedings where the parties' settlement agreement awarded respondent 17.5% of the net proceeds of petitioner's workers' compensation settlement as her interest in that settlement, the trial court properly awarded respondent 17.5% of the $70,000 of the workers' compensation settlement placed in a Medicare set-aside account, notwithstanding petitioner's contention that the funds in that account were not "net proceeds" of the workers' compensation settlement, since the funds in the account fell within the dissolution agreement's definition of "net proceeds" where the parties agreed that monies identified for "medical payments" would be part of the "net proceeds" of the workers' compensation settlement. |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 09-D-478; the Hon. Daniel J. Bute, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Jane M. Ryan (argued) and Nigel S. Smith, both of Law Offices of Peter F. Ferracuti, P.C., of Ottawa, for appellant. |
| | Eric L. Miskell and Ryan Hamer (argued), both of Miskell Law Center, of Ottawa, for appellee. |
| Panel | PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion. |
| | Justice Wright concurred in the judgment and opinion. |
| | Justice McDade dissented, with opinion. |

**OPINION**

¶ 1     Petitioner, Christopher Washkowiak, appeals from the trial court's order awarding respondent, Rosana Washkowiak, $12,250, a figure which represents 17.5% of the portion of his workers' compensation settlement that was placed in a Medicare set-aside account. For the reasons that follow, we affirm.

¶ 2                                    FACTS

¶ 3     Petitioner and respondent were married in 2004. In 2008, petitioner suffered a work-related injury while working for Northern Pipeline Construction (Pipeline). Petitioner subsequently filed a claim for workers' compensation.

¶ 4     In 2009, petitioner filed a petition for dissolution of the parties' marriage. On August 31, 2010, the trial court entered a judgment of dissolution of marriage, which incorporated the parties' settlement agreement. Paragraph 10 of the judgment provides, in pertinent part:

        "10. The Respondent is awarded 17.5% of the net proceeds from the Petitioner's workers' compensation settlement as and for her interest in the same. Net proceeds are defined as the agreed award amount less workers' compensation attorneys' fees and usual and customary litigation fees and expenses. The Petitioner is ordered not to receive any funds from his settlement without first directing his attorney to provide a draft check to the Respondent for her portion herein. Net shall include any reimbursement for unemployment which he actually pays and *medical payments* he actually pays." (Emphasis added.)

¶ 5     On December 9, 2010, an arbitrator of the Illinois Workers' Compensation Commission approved a settlement agreement between petitioner and Pipeline. The agreement released Pipeline from "all past and future obligations for the payment of workers' compensation benefits, indemnity and/or medical benefits." The agreement included a "Workers'

Compensation Medicare Set-aside Arrangement" (MSA). The agreement defined the MSA as "an interest bearing bank account funded solely by the Medicare Allocation and used solely to pay for future Medicare-covered medical and/or prescription drug expenses." The monetary terms of the agreement were listed as follows:

"THE ATTACHED TERMS OF THE SETTLEMENT

| | |
|---|---|
| Total amount of settlement | $365,000 (does not include $70,000 MSA) |
| Deduction: Attorney's fees | $67,903.35 |
| Deduction: Medical reports, X-rays | $766.60 |
| Amount employee will receive | $296,330" |

The settlement agreement also contained the following provisions:

"4. The parties agree that *** Centers for Medicare Services approval of the MSA is not required under CMS policy.

5. The parties agree that of the total settlement amount of $435,000, the amount that is allocated to the MSA is $70,000.

\* \* \*

14. In entering into this *** Agreement, it is not the intentions of the parties to shift responsibility of the Claimant's future medical treatment and/or prescription drug treatment to the Federal government. The allocation of $70,000 is intended directly for payment of Claimant's future treatment related to the work injury that would normally be covered by Medicare so that the parties are in compliance with the Medicare Secondary Payer Act (42 U.S.C. § 1395(b)) and applicable Medicare rules and regulations."

¶ 6 The parties agree that per the terms of the judgment of dissolution, respondent was entitled to 17.5% of the $296,330 petitioner received under the settlement agreement. A dispute, however, arose as to whether respondent was entitled to 17.5% of the $70,000 set aside in the MSA. Petitioner asserted that respondent was not entitled to 17.5% of the MSA funds as the funds were not part of the "net proceeds" of the settlement. Instead, petitioner argued that the funds were set aside solely to satisfy Medicare's interests. Respondent argued, *inter alia*, that she was entitled to 17.5% of the MSA funds as the $70,000 did not fall under the excluded category of "attorneys' fees and usual and customary litigation fees and expenses," as provided in paragraph 10 of the judgment of dissolution. The trial court held that the $70,000 set aside in the MSA was to be included in the net proceeds for purposes of calculating respondent's 17.5% share. Since the undisputed amounts had already been paid, the trial court ordered petitioner to pay respondent $12,250.

¶ 7 ANALYSIS

¶ 8 Petitioner argues that the nature of the MSA precludes the funds in the MSA from being part of the "net proceeds" of the settlement. He does not argue that the funds in the MSA should be excluded from the "net proceeds" by operation of either of the exceptions stated in the dissolution decree: attorney fees and litigation expenses.

¶ 9 Normally a trial court's determination that an asset is marital or nonmarital is reviewed for an abuse of discretion. However, in cases such as this where the determination is one of law and does not involve credibility determinations, our review is *de novo*. *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 819 (2007). The terms of a settlement agreement incorporated into a dissolution decree are interpreted as any other contract. *In re Marriage of Turrell*, 335 Ill. App. 3d 297, 305 (2002). "When the terms are unambiguous, the court determines the parties' intent solely from the language of the instrument." *Id.*

¶ 10 According to the dissolution decree, "net proceeds" include reimbursement for medical payments actually paid by petitioner. The funds in the MSA are part of the settlement with petitioner and are to be used for petitioner's medical payments. Unless there is something about an MSA that removes the MSA funds from the definition of "net proceeds," the funds fall squarely within the dissolution decree's definition of "net proceeds."

¶ 11 We begin with a brief overview of the Medicare program as it relates to an MSA. Prior to 1980, Medicare generally paid for medical services whether or not the recipient was also covered by another health plan. *New York Life Insurance Co. v. United States*, 190 F.3d 1372, 1373 (Fed. Cir. 1999). However, beginning in 1980, Congress enacted a series of amendments to the Medicare program designed to curb skyrocketing health costs and preserve the fiscal integrity of the Medicare system. *Frazer v. CNA Insurance Co.*, 374 F. Supp. 2d 1067, 1071 (N.D. Ala. 2005). "These amendments are known as the 'Medicare as Secondary Payer' ('MSP') statute or the MSP provisions. They are codified at 42 U.S.C. § 1395y."[1] *New York Life Insurance Co.*, 190 F.3d at 1374.

¶ 12 The MSP statute precludes Medicare from providing payment for services to the extent that the payment in question has been made or can reasonably be expected to be made promptly under the applicable workers' compensation act. See 42 U.S.C. § 1395y(b)(2)(A) (2006). This exclusion is also embodied in the Code of Federal Regulations (the Code), which expressly embraces workers' compensation as payment subject to reimbursement to Medicare. See 42 C.F.R. § 411.20(a)(2) (2012). Specifically, 42 C.F.R. § 411.20(a)(2) provides:

"(2) Section 1862(b)(2)(A)(ii) of the Act precludes Medicare payment for services to the extent that payment has been made or can reasonably be expected to be made under ***:

(i) Workers' compensation."

¶ 13 "The Central Office of the Centers for Medicare and Medicaid Services (CMS), as authorized by Congress, has promulgated regulations specifically intended to carry out the mandate of the MSP amendments." *Frazer*, 374 F. Supp. 2d at 1073. For example, 42 C.F.R. § 411.46 establishes that all parties in a workers' compensation case have a duty to protect Medicare's interests when resolving workers' compensation cases that include future medical expenses. See 42 C.F.R. § 411.46 (2012). Specifically, 42 C.F.R. § 411.46 states:

---

[1]The MSP is not an act in the traditional sense but, rather, a series of amendments related to the Medicare act and similar statutes. See *Frazer*, 374 F. Supp. 2d at 1071.

"(a) Lump-sum commutation of future benefits. If a lump-sum compensation award stipulates that the amount paid is intended to compensate the individual for all future medical expenses required because of the work-related injury or disease, Medicare payments for such services are excluded until medical expenses related to the injury or disease equal the amount of the lump-sum payment.

(b) Lump-sum compromise settlement.

(1) A lump-sum compromise settlement is deemed to be a workers' compensation payment for Medicare purposes, even if the settlement agreement stipulates that there is no liability under the workers' compensation law or plan.

(2) If a settlement appears to represent an attempt to shift to Medicare the responsibility for payment of medical expenses for the treatment of a work-related condition, the settlement will not be recognized. For example, if the parties to a settlement attempt to maximize the amount of disability benefits paid under workers' compensation by releasing the workers' compensation carrier from liability for medical expenses for a particular condition even though the facts show that the condition is work-related, Medicare will not pay for treatment of that condition. ***

(d) Lump-sum compromise settlement: Effect on payment for services furnished after the date of settlement–

(1) Basic rule. Except as specified in paragraph (d)(2) of this section, if a lump-sum compromise settlement forecloses the possibility of future payment of workers' compensation benefits, medical expenses incurred after the date of the settlement are payable under Medicare.

(2) Exception. If the settlement agreement allocates certain amounts for specific future medical services, Medicare does not pay for those services until medical expenses related to the injury or disease equal the amount of the lump-sum settlement allocated to future medical expenses."

¶ 14    The workers' compensation settlement in this case included an MSA whereby the parties to the workers' compensation claim allocated $70,000 of the $435,000 settlement for future medical expenses resulting from the work injury. Thus, Medicare will pay for covered medical services only after the exhaustion of the $70,000. See 42 C.F.R. § 411.46(d)(2) (2012). An individual claimant receiving a lump-sum settlement that includes a future medical care component is obligated to exhaust those funds before Medicare can be made responsible for medical payments. Therefore, the $70,000 placed into the MSA is for the sole purpose of paying petitioner's medical bills; the settlement is reimbursing him for his future medical costs. Accordingly, the funds in the MSA fall squarely under the definition of "net proceeds" contained in the dissolution agreement.

¶ 15    Petitioner presents no evidence that the funds in the MSA are not "net proceeds." There is no question the money is his. The settlement was between petitioner and Pipeline; petitioner was given the money. It is not Medicare's or Pipeline's money. The MSA clarifies how much of the settlement is intended to pay for future medical costs associated with the injury and places that amount in a separate account so that it can be shown that those funds

were used to pay petitioner's medical costs caused by the injury. Since the dissolution decree defines "net proceeds" to include payment for future medical costs, the funds in the MSA are net proceeds. The trial court correctly determined that respondent is entitled to 17.5% of the entire settlement.

¶ 16 Petitioner also argues that respondent cannot be given 17.5% of the funds in the MSA since those funds are only to be used to pay for his future medical costs. Petitioner and the dissent ignore the key fact that he agreed to include funds received for medical payments as part of the "net proceeds" subject to respondent's 17.5% claim. In making this argument, petitioner attempts to subdivide the net proceeds into separate funds to be dealt with individually. This is not supported by the dissolution decree. The dissolution decree requires that respondent receives 17.5% of the net proceeds. Petitioner can provide that 17.5% from the settlement funds and still leave $70,000 in the MSA. This is in no way inequitable. Respondent receives 17.5% of the net proceeds; petitioner gets the rest. From his remaining 82.5%, he places (or leaves) $70,000 in MSA. The dissent's public policy argument is without merit. The trial court simply enforced the contract petitioner made.

¶ 17 The dissent's statement that "Medicare is the sole beneficiary of any and all MSAs, as these accounts are created solely to protect Medicare's interests," is incorrect. *Infra* ¶ 28. The MSA fund is set aside to pay the first $70,000 of any future medical bills petitioner may incur as a result of the work-related injury. If he incurs no such bills, he gets the money back. If he does incur such bills, he pays them from the MSA. The money does not go to Medicare. In essence, in settling his workers' compensation claim, petitioner agreed to earmark $70,000 for his future medical bills. In settling the property claims in his marital dissolution, petitioner agreed that monies identified for "medical payments" would be part of the "net proceeds." The $70,000 that petitioner chose to place in the MSA falls squarely within the petitioner's own definition of "net proceeds." The dissent picks one sentence out of paragraph 10 of the agreed dissolution order and ignores another sentence that states, "Net shall include any reimbursement for unemployment which he actually pays and medical payments he actually pays." The dissent manufactures an ambiguity by ignoring part of the paragraph. There is no ambiguity.

¶ 18 Lastly, the dissent correctly notes that we failed to address respondent's argument that the MSA in this case was not mandatory and, therefore, is a sham. We ignored this argument, not because of a perceived lack of subject matter jurisdiction, but because we affirm the trial court on the assumption that the MSA was established in good faith. We find no reason to address respondent's additional argument in support of affirming the trial court.

¶ 19 CONCLUSION

¶ 20 For the foregoing reasons, the judgment of the circuit court of La Salle County is affirmed.

¶ 21 Affirmed.

¶ 22 JUSTICE McDADE, dissenting:

¶ 23 The issue, as framed by petitioner, is whether "the trial court erred in ruling that [the] MSA funds were to be included in the 'net proceeds' of petitioner's workers' compensation settlement and that therefore respondent was entitled to 17.5% of those funds [per the terms of the judgment of dissolution]." I dissent from the majority's decision affirming the trial court's judgment. Because the MSA funds were set aside for the sole purpose of satisfying Medicare's interests, I would find that they are not part of the "net proceeds" of the settlement.

¶ 24 At the outset, I note that the majority has failed to address an issue raised by respondent. While respondent appears to acknowledge an individual claimant receiving a lump-sum settlement, which includes a future medical care component, is obligated to exhaust those funds before Medicare can be made responsible for medical payments, she challenges the validity of the MSA in the instant case. Specifically, respondent argues that the creation of the MSA "was not mandatory" under the Central Office of the Centers for Medicare and Medicaid Services (CMS) guidelines. Instead, she speculates that the MSA was "a sham created by petitioner in hopes of taking more than his share of the workers' compensation settlement."

¶ 25 I would find that this court lacks subject matter jurisdiction to decide the validity of the MSA.[2] The creation of the MSA stems from a separate workers' compensation action. Respondent was not a party to that action. Instead, petitioner and Pipeline were the only parties to the workers' compensation action. Neither petitioner nor Pipeline appealed from the settlement order approved by the Illinois Workers' Compensation Commission. Thus, the MSA stands as created and may not now be attacked collaterally by respondent. The only valid question presently before this court is whether respondent is entitled to 17.5% of the MSA.

¶ 26 Paragraph 10 of the judgment of dissolution provides, in pertinent part: "[r]espondent is awarded 17.5% of the net proceeds from the Petitioner's workers' compensation settlement." In light of the above authority, I find the $70,000 set aside in the MSA does not constitute "net proceeds." While I recognize paragraph 10 expressly identifies "net proceeds" as "the agreed award amount less workers' compensation attorney's fees and usual and customary litigation fees and expenses," the existence of the MSA creates a latent ambiguity in paragraph 10 because the intended beneficiary of the MSA is Medicare and the federal treasury, not petitioner, or for that matter, respondent. Stated another way, the "Medicare as Secondary Payer" (MSP) statute, 42 U.S.C. § 1395y (2006) and specifically, 42 C.F.R. § 411.46 (2012), does not confer a benefit upon petitioner or respondent. Instead, the statutes are intended to protect Medicare's interests when resolving workers' compensation cases that include future medical expenses. See 42 C.F.R. § 411.46. The workers' compensation settlement agreement illustrates this fact in that it expressly identifies that the $70,000 is not

_____

[2]Subject matter jurisdiction refers to a court's power to both adjudicate the general question involved and to grant the particular relief requested. *Government Employees Insurance Co. v. Hersey*, 397 Ill. App. 3d 551, 554 (2010).

-7-

included in the "[t]otal amount of settlement [($365,000)]." After subtracting deductions in the amount of $67,903 for attorney fees and $766 for medical reports and X-rays from the $365,000, the "net proceeds" petitioner received from Pipeline, per the settlement agreement, was $296,330. Consequently, I would hold respondent is only entitled to 17.5% of $296,330 at this time.

¶ 27 The majority, in finding the judgment of dissolution to be unambiguous, erroneously relies upon the following sentence found in paragraph 10 of the judgment: "Net shall include any reimbursement for unemployment which he actually pays and medical payments he actually pays." The majority's citation to this sentence alone establishes an internal conflict within the judgment rendering it ambiguous. Again, the clear intent of petitioner and respondent was to ensure respondent received 17.5% of the net proceeds of petitioner's workers' compensation settlement. The workers' compensation settlement agreement, however, expressly provides that the MSA funds are not included in the total amount of the settlement. The judgment of dissolution is devoid of any reference to MSA funds. Moreover, the MSA funds do not constitute a "reimbursement for *** medical payments." Instead, the MSA funds are funds set aside to protect Medicare's interests in case petitioner is required to seek medical treatment or care in the future. Thus, the majority's reliance upon the above sentence has no bearing or relevance on the precise issue before us.

¶ 28 Even if I were to assume that paragraph 10 is not ambiguous and the parties did in fact intend the MSA funds to be part of the "net proceeds" of the settlement agreement, paragraph 10 would, in such a case, be void as against public policy.[3] Medicare is the sole beneficiary of any and all MSAs, as these accounts are created solely to protect Medicare's interests. Both parties acknowledge that all funds held within an MSA can only be used for future medical expenses. I therefore believe it would violate public policy to allow respondent to take 17.5% from the funds allocated to Medicare for her own personal use. Such a diversion of funds not only harasses logic, but it also cuts against the grain of the plethora of legislative authority that has been enacted since 1980 in an effort to curb skyrocketing health costs and preserve the fiscal integrity of the Medicare system.

¶ 29 The majority disagrees with my assertion that Medicare is the sole beneficiary of the MSA account. The majority appears to believe that Medicare is not the beneficiary of the MSA because "[t]he money does not go to Medicare." *Supra* ¶ 17. While the majority is correct that the MSA funds do not go directly to Medicare, it ignores the fact that these funds ensure that Medicare is not liable for any future medical payment until the funds have been exhausted. Stated another way, although the MSA funds do not increase the amount of revenue being brought into Medicare's coffers, the funds will decrease the expenses drawn from Medicare's coffers in the event that petitioner requires further treatment. The majority's position that Medicare only qualifies as a beneficiary if the MSA funds go directly to Medicare overlooks the fact that the entire purpose of an MSA is to protect Medicare's interests, not the interests of the claimant or the claimant's ex-spouse.

---

[3]Courts have the power to find a contract or contract provision void on the grounds public policy. *In re M.M.D.*, 213 Ill. 2d 105, 114 (2004).

¶ 30     The majority also claims that if petitioner incurs no medical bills, "he gets the money ($70,000) back." *Supra* ¶ 17. The majority is simply incorrect. I believe that the majority's failure to cite any authority in support of its proposition derives from the fact that no such authority exits. Based on my review of the statute and attendant policies, it appears the only instance where a claimant may possibly "get[ ] the money back" is in the person of his or her estate upon death.[4] Specifically, the CMS policy memorandum[5] dated April 22, 2003, provides:

> "21) If a beneficiary or injured individual dies before the Medicare set-aside arrangement is completely exhausted, what happens to the remaining money?
>
> Answer: Once the RO and the contractor responsible for monitoring the beneficiary's case ensure that all of the beneficiary's claims have been paid, then any amount left over in the beneficiary's Medicare set-aside arrangement may be disbursed pursuant to state law, once Medicare's interests have been protected. This may involve holding the Medicare set-aside arrangement open for some period after the date of death, as providers, physicians, and other suppliers are permitted to submit their initial bill to Medicare for a period ranging from 15-27 months after the date of service." Thomas Grissom, *Medicare Secondary Payer–Workers' Compensation (WC) Frequently Asked Questions*, Centers for Medicare & Medicaid Services (April 22, 2003), https://www.cms.gov/WorkersCompAgencyServices/Downloads/42203Memo.pdf.

¶ 31     Previously, there appeared to be one other circumstance where a claimant may possibly "get[ ] the money back." This circumstance was discussed in question/answer 10 of the CMS policy memorandum dated July 11, 2005, and was entitled "Beneficiaries that Request Termination of a Workers' Compensation Medicare Set-Aside Account (WCMSA)." It stated:

> "Q10. Beneficiaries that Request Termination of a WCMSA Account–May a claimant have any or all of a WCMSA released for personal purposes under any circumstances?
>
> A10. The administrator of the CMS-approved WCMSA should not release set-aside funds for any purpose other than the purpose for which the WCMSA was established without approval from CMS. However, if the treating physician concludes that the beneficiary's medical condition has substantially improved, then the beneficiary (or the beneficiary's representative) may submit a new WCMSA proposal covering future expected medical expenses. Such proposals must justify at least a 25% reduction in the outstanding WCMSA funds. In addition, such proposal may not be submitted until at least five years after a previous CMS approval letter and should be accompanied by all supporting documentation not previously submitted with the original WCMSA proposal.

---

[4]It would be the claimant's estate not the claimant him- or herself who may be entitled to the funds.

[5]CMS has issued several policy memorandums with answers to frequently asked questions on MSAs.

The CMS decision on the new proposal is final and not subject to administrative appeal.

The above proposals shall be submitted to CMS c/o COBC. If CMS determines that a 25% or greater reduction is justified, CMS will issue a new approval letter. After CMS issues a new approval letter, any funds in the current WCMSA in excess of the newly calculated amount may be released to the claimant." Gerald Walters, *Medicare Secondary Payer (MSP)–Workers' Compensation (WC) Additional Frequently Asked Questions*, Centers for Medicare & Medicaid Services (July 11, 2005), https://www.cms.gov/WorkersCompAgencyServices/Downloads/71105Memo.pdf.

¶ 32    Effective August 25, 2008, however, the July 11, 2005 memorandum at question/answer 10, entitled "Beneficiaries that Request Termination of a WCMSA Account," was rescinded. The memorandum dated August 25, 2008, stated, in pertinent part:

"Effective immediately, the July 11, 2005 memorandum at Question and Answer 10, entitled 'Beneficiaries that Request Termination of a WCMSA Account,' is rescinded. Section 1862(b)(2) of the Social Security Act (the Act) (42 USC 1395y(b)(2)) requires that Medicare payment may not be made for any item or service to the extent that payment has been made under a workers' compensation (WC) law or plan. Medicare does not pay for an individual's WC related medical services when that individual received a WC settlement, judgment or award that includes funds for future medical expenses, until all such funds are properly expended. To protect the Medicare Trust Fund, a set-aside arrangement should be funded based on the life expectancy of the individual unless the State law specifically limits the length of time that WC covers work-related conditions." Gerald Walters, *Medicare Secondary Payer–Workers' Compensation Information*, Centers for Medicare & Medicaid Services (Aug. 25, 2008), https://www.cms.gov/WorkersCompAgencyServices/Downloads/82508Memo.pdf.

¶ 33    The fact that CMS rescinded question/answer 10 entitled, "Beneficiaries that Request Termination of a WCMSA Account," illustrates an intent to deny a claimant any opportunity to petition to "get[ ] the money back" during his or her lifetime. Instead, the express policy behind rescinding question/answer 10 is to "protect the Medicare Trust Fund," not the claimant. Thus, it appears, based on my review of the statutory provisions and administrative interpretations, that the only circumstance where a claimant may possibly be allowed to "get[ ] the money back" is when he or she dies. Even in this situation, however, a claimant's estate is only entitled to the remaining MSA funds after all of Medicare's interests have been satisfied. The majority's assertion that petitioner "gets the money ($70,000) back" (*supra* ¶ 17) if he does not incur any medical bills is not only unsupported, it is superficial and misleading.

¶ 34    I note that some discussion has been had both here on appeal and in the trial court regarding this hypothetical question of what is to happen to the MSA funds if petitioner does in fact die prior to exhaustion of the funds. This question is not ripe for our review. See *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 252 (2010) (court noted that the doctrine of ripeness seeks to insure that courts decide actual controversies and not speculative or abstract questions).

¶ 35    For the foregoing reasons, I would reverse the judgment of the trial court holding that

respondent is entitled to 17.5% of the MSA funds and remand the matter for further proceedings.