# Illinois Official Reports

## Appellate Court

*In re Marriage of Faber*, 2016 IL App (2d) 131083

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF MARK FABER, Petitioner-Appellant and Cross-Appellee, and CAROLE FABER, Respondent-Appellee and Cross-Appellant. |
| District & No. | Second District<br>Docket No. 2-13-1083 |
| Filed | February 26, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 11-D-813; the Hon. Veronica M. O'Malley, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Howard A. London and Matthew D. Elster, both of Beermann Pritikin Mirabelli Swerdlove LLP, of Chicago, for appellant.<br><br>Christopher A. White, of White, Scott & White, of Lake Bluff, for appellee. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.<br>Presiding Justice Schostok and Justice Birkett concurred in the judgment and opinion. |

## OPINION

¶ 1 Petitioner, Mark Faber, appeals from the trial court's allocation of property and debt in its order of dissolution of marriage. Mark disagrees with specific valuations and distributions ordered by the trial court regarding his: (1) nonmarital 401(k) retirement account; (2) Employee Stock Ownership Plan (ESOP); (3) phantom stock that he had received by virtue of his ownership interest in Chicago Metallic Products (CMP), at which he was employed; and (4) subordinated notes that he held from CMP. In her cross-appeal, respondent, Carole Faber, appeals from the trial court's denial of her request for attorney fees.[1] We affirm the trial court.

¶ 2 The marriage of Mark and Carole began on June 16, 1999, and ended on August 20, 2013. Mark and Carole had both extensive assets and extensive debts, both marital and nonmarital, and they stipulated to much of the valuation and distribution of these assets and debts before trial. After trial, the court found that "an award of property in lieu of maintenance is warranted, especially when there is sufficient property available to disentangle the parties." Such an award would allow Carole "to live at a level she enjoyed during the marriage." Thus, the court awarded 55% of all marital property to Carole and 45% to Mark. The trial court denied Carole's request for attorney fees.

¶ 3 Mark raises several issues regarding the trial court's classification of certain contested assets. Before a court may distribute property upon the dissolution of a marriage, it must first classify the property as either marital or nonmarital. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44. A court's classification of property will not be disturbed on appeal unless it is against the manifest weight of the evidence, and a decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence. *Id*.

¶ 4                                                          401(k)

¶ 5 Mark first contends that the trial court erred in determining that all of the appreciation of his Fidelity 401(k) account was marital property. Mark and Carole had stipulated in writing that Mark became a participant in the 401(k) plan before their marriage, and the account's value (net of obligations to Mark's first wife that had not yet been fulfilled) at the time of their marriage was $93,020. Mark contributed to the account every year during the marriage. Mark later opened an individual retirement account (IRA) that contained: (1) a rollover of his 401(k), following the closing of the sale of CMP in November 2011, in the amount of $656,951 and (2) a deposit of $762,144 from his ESOP. Mark and Carole attached to their stipulations as an exhibit a spreadsheet "prepared in accordance with these stipulations." According to the stipulations, "[t]he parties represent and warrant that this balance sheet is accurate and complete." While the spreadsheet indicated how the assets were titled or currently held, these indications were "pre-distribution by the Court." The spreadsheet showed a United States Trust IRA valued at $1,472,946 as of September 27, 2012, currently held by Mark; however, it further noted that the asset was "Subject to Non-Marital reimbursement Claim."

---

[1]Carole has also filed a motion to strike portions of Mark's reply brief. We deny this motion but will disregard any factual assertions in the briefs not supported by the evidence admitted at trial.

¶ 6        In May 2011, in response to Carole's pretrial request for documents, Mark produced Fidelity statements regarding the 401(k) account from May 1999, the year-end statements for 2008 through 2010, and the plan document. In August 2012, Carole informed Mark that her expert, Steve Mareta, was trying to determine the marital and nonmarital portions of the 401(k) and the ESOP. Mareta had relayed that such a determination might not be possible "due to comingling" and would be impossible without all the statements relating to those assets from 1999 to the present time. Without those statements, Mareta would "have no choice but to analyze as if the ESOP and 401(k) are 100% marital, subject, perhaps, to reimbursement of Mark Faber's non-marital estate for the premarital values in existence as of the date of the marriage without any credit for post-marital appreciation of the premarital investments." At trial, which began October 1, 2012, Mareta testified that the 401(k) had increased in value by $563,931 during the marriage; however, he could not determine how much of the appreciation was Mark's nonmarital portion because Mark had failed to produce the necessary statements. He therefore opined that all of the increase in value was marital.

¶ 7        On November 7, 2012, after Mareta testified, Mark moved to admit the 401(k) statements from 1999 to the current date, "so as to properly calculate his non-marital interest in the plan." Mark alleged that he had been looking for the statements since at least September 6 and had been in contact with Fidelity multiple times since then; however, he did not receive the statements until October 31. Carole objected, and the matter was argued on January 23, 2013. The trial court noted that Carole had requested the documents in May 2011 and that Mark did not try to obtain the documents until just before trial began, "in violation of the Supreme Court Rules and the Court's discovery rules in this case." The court found that it would be "patently unfair" to allow Mark to present documents after Carole's expert had already testified and been released, and it noted that "there has been much delay attributed to the husband's side of this case." Admitting the documents would amount to unfair surprise and prejudice and cause tremendous delay, and the court could not "condone the failure to tender documents in a timely fashion." Therefore, the court denied the motion.

¶ 8        In its oral ruling, the court noted that Mareta "credibly testified based on Husband's failing to provide all the monthly 401(k) statements that Mareta could not calculate the interest in earnings attributed to Husband's premarital amount" in the 401(k). Further, as additional funds were added to the account each year during the marriage, Mark needed to also provide W-2 forms and other payroll records in order to make the calculations. The court ruled, "the failure of Husband to comply with the discovery rules and tender the proper documents has led this court to conclude and agree with Mareta that all increases above the $93,020 are deemed marital property." As noted, ultimately the court distributed 55% of the marital property to Carole.

¶ 9        In general, as noted, a trial court's determination that an asset is marital or nonmarital will be disturbed only if it is against the manifest weight of the evidence. *Romano*, 2012 IL App (2d) 091339, ¶ 44. However, where the determination is one of law and does not involve determinations of credibility, our review is *de novo*. *In re Marriage of Washkowiak*, 2012 IL App (3d) 110174, ¶ 9. Mark argues that such is the case here. According to Mark, the trial court incorrectly applied section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503 (West 2012)) and improperly placed the burden on him to establish the marital and nonmarital portions of the 401(k).

¶ 10    In general, all property acquired after a marriage and before a judgment of dissolution of marriage, "including non-marital property transferred into some form of co-ownership between the spouses," is presumed to be marital property. 750 ILCS 5/503(b)(1) (West 2012). This presumption may be overcome by a showing that the property was acquired by a method listed in section 503(a) of the Act. *Id*. Section 503(a)(6) of the Act provides that property acquired before the marriage is nonmarital property. See 750 ILCS 5/503(a)(6) (West 2012). Any increase in the value of nonmarital property is also considered to be nonmarital property, "irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c)." 750 ILCS 5/503(a)(7) (West 2012). Under section 503(c), where marital and nonmarital property are comingled "by contributing one estate of property into another resulting in a loss of identity of the contributed property, the classification of the contributed property is transmuted to the estate receiving the contribution." 750 ILCS 5/503(c)(1) (West 2012). An estate that makes a contribution to another estate "shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation," provided that the contribution is "traceable by clear and convincing evidence." 750 ILCS 5/503(c)(2) (West 2012). Thus, according to Mark, since the 401(k) was nonmarital property, all of the increase in its value during the marriage was nonmarital property, the Act placed the burden on Carole to prove by clear and convincing evidence the amount of the marital contribution that should be reimbursed to the marital estate, and the trial court erred in placing the burden on him.

¶ 11    First, we note that, for support, Mark points only to the court's statement that "the failure of Husband to comply with the discovery rules and tender the proper documents has led this court to conclude and agree with Mareta that all increases above the $93,020 are deemed marital property." However, failing to comply with discovery rules is not the same as failing to sustain a burden of proof. Mark's failure to tender the proper documents prevented Mareta from classifying the increase in the 401(k)'s value. Mark was not required to prove anything; however, he was required to tender the proper documents to allow Carole to try to prove that the increase was marital.

¶ 12    The record shows that the trial court's ruling on the 401(k) appreciation was based on Mareta's credible testimony. Mark did not present any expert evidence regarding the specific earnings of the nonmarital funds in the IRA. Thus, the court actually placed the burden on Carole, not Mark, and this placement of the burden was an error. According to section 503(c), commingled marital and nonmarital property "shall be treated" in the manner that Mark describes in his argument, "*unless otherwise agreed by the spouses.*" (Emphasis added.) 750 ILCS 5/503(c) (West 2012). The spreadsheet attached to the trial stipulations specified that the funds in the IRA were "Subject to Non-Marital Reimbursement Claim." Thus, Mark and Carole agreed that Mark's nonmarital estate would be required to claim reimbursement from the marital estate, an agreement allowed under section 503(c). Again, we note that Mark did not present any expert evidence regarding the earnings of the nonmarital funds in the IRA. Thus, to the extent that the trial court erred in placing the burden of proof regarding the appreciation of the 401(k) account, it erred in placing the burden on Carole, not on Mark.

¶ 13    Mark also argues that, "[t]o the extent that the trial court sanctioned Mark's noncompliance with discovery by allocating 100% of the appreciation in his 401(k) to the marital estate, such a sanction is improper." However, the trial court's allocation of the appreciation was not a

sanction. The allocation was part of the trial court's judgment, reached after hearing all of the evidence. The sanction was the trial court's denial of Mark's motion to admit the 401(k) statements, which the trial court entered because Mark failed to timely produce the documents, "in violation of the Supreme Court Rules and the Court's discovery rules in this case." It is well established that trial courts have wide discretionary powers in matters of pretrial discovery, the inherent authority to control their dockets, and the inherent authority to enter sanctions for a party's failure to obey valid orders. See *Redelman v. K.A. Steel Chemicals, Inc.*, 377 Ill. App. 3d 971, 976-77 (2007). Further, "So long as there is sanctionable conduct, even without having violated a specific court order, a party who fails to comply with the supreme court rules regarding (1) discovery, (2) requests for admissions, and (3) pretrial procedure may be subject to sanctions that are as severe as dismissal." *Id.* at 977. The allocation, however, was based on the admitted evidence and was not a punishment.

¶ 14 Mark was not improperly burdened with proving the proper allocation of the appreciation in the 401(k) account, nor was he improperly sanctioned for his failure to comply with discovery. Any trial court error regarding the burden actually inured to Mark's benefit. However, his own failings in this respect led to the results of which he now complains, and he is entitled to no relief here.

¶ 15                                                               ESOP

¶ 16 Mark next contends that the trial court erred as a matter of law in determining that 100% of the increase in the value of his ESOP account was marital. According to Mark, the "undisputed evidence" showed that he held a 29.45% nonmarital interest in the ESOP such that "the only conclusion permitted by law and by the evidence is that 29.45% of the proceeds traceable to that non-marital ownership interest" was Mark's nonmarital property.

¶ 17 Mark stipulated that the value of his ESOP account as of the date of the marriage (net of unfulfilled transfer obligations to his first wife) was $17,053. Yearly contributions were made to the ESOP during the course of the marriage. As of December 31, 2011, the account contained $85,061 in company shares and $1,016,192 in cash and other securities, $762,144 of which was later deposited into his IRA. Per the stipulation, the money contained in the IRA was "Subject to Non-Marital Reimbursement Claim."

¶ 18 We first note again that, in general, all property acquired after a marriage and before a judgment of dissolution of marriage is presumed to be marital property. 750 ILCS 5/503(b)(1) (West 2012). Mark makes the same argument regarding the burden of proof as to the marital or nonmarital status of the increase in value of the ESOP account that he did regarding the 401(k) account, and his argument fails here, too. Mark stipulated that the value of the account as of the date of the marriage was $17,053 and that the rest of the money at issue here was subject to nonmarital reimbursement; the burden thus was on Mark to prove that any amount beyond the $17,053 was nonmarital. Accordingly, his argument that the trial court erred as a matter of law in determining that any of the ESOP was marital is without merit.

¶ 19 We also find unavailing Mark's claim that the "undisputed evidence" showed that he held a 29.45% nonmarital interest in the ESOP account such that "the only conclusion permitted by law and by the evidence is that 29.45% of the proceeds traceable to that non-marital ownership interest" was Mark's nonmarital property.

¶ 20     At trial, Mareta testified that 29.45% of the total shares in Mark's ESOP account as of December 31, 2011 were nonmarital property. However, there were two components to the ESOP: "shares" and "other investments." Mareta ascribed a value of $1,016,192 to the "other investments." When asked why he did not ascribe any of the value of the other investments to the nonmarital shares, Mareta explained that he compared similarly formatted ESOP statements from May 31, 1999 (just before the wedding) and December 31, 2011. The May 1999 statement did not contain any investments other than the company stock. It appeared to Mareta that "all of the assets–other investments that are part of Mr. Faber's account were acquired during the period after May 31, 1999, up to December 31, 2011." Mareta explained the method that he would have used to calculate the portion of the other investments that would be attributable to the nonmarital shares, but he noted that the records he needed to make the calculation were not provided to him. He specifically stated that he was not given documents to calculate the growth in the ESOP in the years 2009 through 2011. Part of the total value of the account was "in cash and securities that would not necessarily be related to the shares owned at the date of marriage."

¶ 21     In its oral ruling, the trial court stated:

> "Once again, Husband's failure to tender sufficient documentation including sufficient credible evidence showing price per share or value at the date of sale or proper comprehensible evidence regarding stock splits together with significant contributions made by the Husband during the marriage due to his work efforts and commingling of assets has led this court to conclude that all increases of this account above is [*sic*] the $17,053 all occurred during the marriage are deemed marital property."

¶ 22     The only evidence presented at trial ascribed the increase in the value of the ESOP to "other assets" acquired during the marriage. Once again, no other calculation was feasible, because Mark failed to supply necessary documentation. As we have previously noted, the burden was on Mark to show that any increase in the value of the ESOP was nonmarital. Not only did he fail to do so, he prevented any calculation other than that provided by Mareta, which showed that all of the increase was marital. Thus, the trial court's conclusion that all of the increase in the ESOP account's value, above $17,053, was marital was not against the manifest weight of the evidence.

¶ 23                                    PHANTOM STOCK

¶ 24     Mark next contends that the trial court erred in its allocation of phantom stock. Before the marriage, Mark owned approximately 32,462 shares of stock in CMP. These shares were, by stipulation, nonmarital. In 2004, as part of the corporate restructuring that led to the creation of the ESOP, all individual shareholders sold their outstanding shares to CMP, causing the company to become wholly owned by the ESOP. The shareholders received subordinated notes from CMP. At that time, Mark owned approximately 60,000 shares, 54.05% of which were nonmarital. Mark received three subordinated notes, totaling $1,059,952; however, the planned issuance of phantom stock to the shareholders did not materialize.

¶ 25     Soon thereafter, Mark became CEO of CMP, and, in December 2006, he implemented the phantom stock plan. Mark described phantom stock as:

- 6 -

"like receiving a share of stock except for the fact that it wasn't really a share of stock. It just followed the value of the share of stock. But there were no voting rights or anything like that. It's phantom. It looks like stock, but it's not stock."

Although the plan involved portions of both phantom stock and stock-appreciation rights, Mark was involved in only the phantom-stock portion. Mark, Rick Barton, and Mike Jenkins, all of whom had been managers and had previously owned and surrendered their stock to the company, received the same number of phantom shares. However, while Mark and Jenkins had each previously owned and surrendered 60,000 shares of CMP stock, Barton had owned and surrendered 139,000 shares. According to the testimony of Suzanne Saxman, CMP's corporate attorney and once a member of its board of directors, phantom shares were issued proportionately to the number of shares that they had acquired as officers of the company, not to the actual number of shares that they had surrendered. Barton had inherited and been gifted some of his shares. Between December 2006 and July 20, 2011, Mark received 1888.5 shares of phantom stock (which were also affected by a 10:1 stock split) in five separate tranches.

¶ 26        The phantom stock plan documents stated that the plan "is solely an arrangement to pay deferred compensation." Barton agreed that, according to the plan, one of the purposes was "to furnish incentives *** through rewards based upon the performance of the common stock of the company." The phantom stock did not fully vest upon issuance; it vested over time, consistent with the purpose of the plan being an incentive to work hard and build the shareholder value of the company. The phantom stock "was for incentive to grow the company and to make up for the [2004] swap." Saxman also testified that, in addition to being a motivational tool, the phantom stock was looked at as a way "to restore a little bit of that lost value that had taken place in 2004," as the subordinated notes—issued when shareholders sold their outstanding shares to CMP, causing the company to become wholly owned by the ESOP—were undervalued.

¶ 27        Mark testified that as CEO he helped draft the phantom stock plan and signed it into existence. Although the stated purpose of the plan was to pay deferred compensation, that stated purpose was "form over substance." When asked if the phantom stock plan "does not correctly state the purpose" of the plan, Mark replied, "Yes and no." Mark explained that the plan "was not intended to be a deferred compensation program for [himself], Mike Jenkins, and Rick Barton." When asked if he "signed an agreement that was incorrect," he replied, "In substance, yes." Mark stated that one of the major purposes of the plan "was to keep Rick Barton, [Mark] and Mike Jenkins at the company. Without that we would have walked and not even been there." He also agreed that another purpose was "to incentivize [Mark] and Mr. Jenkins and Mr. Barton to work hard to increase shareholder value." Only 25% of the shares of phantom stock vested immediately, and the recipient had to work all of the following year for the next 25% to vest. According to Mark, all of the tranches of phantom stock were issued to make up for what had been denied to them in 2004.

¶ 28        The trial court found Mark's contention that the phantom stock was issued to make up for lost value in the 2004 swap to be "simply not credible," as "[t]he evidence does not support that conclusion." The court noted that paragraph one of the phantom stock plan "clearly states that it was solely an arrangement for deferred compensation" and that the purpose "never changed" in any subsequent phantom stock issuance. The court made extensive findings regarding the stock and Mark's testimony regarding it:

"Husband reluctantly admitted that prior to 2006 he did not own any Phantom stock and Husband provided no credible tracing of this stock to a non-marital asset. He even admitted that he made different statements regarding what portions of this estate is marital versus non-marital during his deposition and in his interrogatories leading this court to find that the Husband will say anything to decrease the value of the marital estate and defeats [*sic*] Wife's interest in the Phantom stock.

Husband admitted that he drafted the Phantom Stock Rights Plan as CEO with the help and assistance of Attorney Suzanne Saxman, and he was impeached numerous times regarding the purposes of the plan, i.e., he denied it was a deferred compensation plan for Husband and others and then later admitted it was. Moreover, when the company sold, the largest portion of money Husband received was from the sale of Phantom stock and Husband received a W-2 tax form in connection with the sale.

Furthermore, the main benefits of the Phantom Stock Rights Plan were to retain key management, set forth a vesting schedule which had only 25 percent vesting immediately, and required one to continue to work at the company for the remainder of the vest. If one died he forfeited any unvested stock. If one were fired for cause then you lost it all. Clearly Phantom stock did not make up for any 2004 losses and it suffices to say that the evidence is overwhelming that all the Phantom stock is marital."

¶ 29 Mark argues that the testimony "overwhelmingly" showed that, while the phantom stock plan was structured as deferred compensation "for income tax purposes," the stock was issued for "the sole purpose of restoring the shareholder equity that Mark and the other two concerned shareholders lost as a result of the 2004 exchange of stock for subordinated notes." However, no one, not even Mark, testified that the "sole purpose" was restoring shareholder equity. Mark further argues that it is "understandable that the trial court would question the treatment of the phantom stock as deferred compensation for income tax purposes; however, this treatment is not controlling where it is established that the true purpose of the stock issuance is to preserve stock equity, not to serve as compensation for present or future services."

¶ 30 The evidence does not disclose that the "true purpose" of the phantom stock plan was to preserve stock equity, nor does it show that the trial court's allocation of the phantom stock as marital property was against the manifest weight of the evidence. The phantom stock was not issued until December 2006, during the marriage of Mark and Carole. There is no evidence by which that stock can be traced back to any nonmarital asset, including Mark's CMP stock, which was sold in 2004 to create the ESOP. While Mark, Saxman, and Barton testified, to varying degrees, that the plan was created, at least in part, to restore some of the value lost in 2004, all also testified that the plan was implemented to incentivize Mark, Jenkins, and Barton to work hard to increase shareholder value. The plan explicitly stated that it was "solely an arrangement to pay deferred compensation." It fully operated as such a plan, especially in light of the vesting periods required for all tranches of the stock. The trial court was not required to believe that the plan was instituted for something other than its stated purpose. We find no error in the trial court's determination that the phantom stock was 100% marital property.

¶ 31 SUBORDINATED NOTES

¶ 32 Mark next contends that the trial court erred in its marital/nonmarital allocation of more than $2 million of CMP subordinated notes that he held and loans that he had taken from CMP. At the time of the 2004 stock buyback that created the ESOP, Mark received subordinated

notes in exchange for his stock. These notes were valued at $2,015,890, including interest, when CMP was sold. Mareta testified that 54.05% of the $2,015,890 was nonmarital property, while 45.95% was marital, percentages that the court and Mark accepted. At the same time, Mark owed the company $680,720 in principal and interest for loans he had taken from the company to pay marital expenses. When CMP was sold, the total payment to Mark from CMP was $1,335,170, the total amount of the subordinated notes minus the amount Mark owed CMP.

¶ 33     In two trial exhibits, Mark referred to the $680,720 as advances against the amount owed to him pursuant to the subordinated notes and, in his deposition he agreed, as the term "set off" was used to describe the relationship between the loans and the subordinated notes. Mark's counsel also referred to the "over $680,000 in advances against [Mark's] notes." However, Mark testified at trial regarding the advances:

> "They represent demand notes which are–that I owed to the company. It's the company that I borrowed–money that I borrowed from the company. The schedule is misleading in the sense that it shows it as–you would think that it was an advance against the subordinated notes, but in fact, the advances were a completely separate transaction. The two are not linked at all."

¶ 34     Mareta testified that he reduced the gross value of the subordinated notes by the amount of the advances that Mark received, because the document that he reviewed "indicated that the payout on the notes was after the advances." When asked if he was aware that there were separate promissory notes for the loans, Mareta stated that he had not seen any such promissory notes. As he reviewed one of the subordinated notes in court, he stated that he did not see any provision allowing advances but that two provisions allowed certain types of prepayments. He then was shown Carole's exhibit 12, regarding the total proceeds from the sale of CMP. That document showed the value of the subordinated notes, with "a provision for advances" that was located "right under the amount for the notes." Mareta did not inquire as to whether the advances were separate transactions from the notes; he assumed they were related because of the placement of the advance provision on the payout documentation and his tracing of the funds, and he stated that "the fact that [the advances] were subtracted seems to clearly indicate that they were part of the transaction."

¶ 35     In its ruling, the trial court noted:

> "Husband had signed an agreement with the company making the $680,720 as an advance against the entire value of all the notes. Husband does not want his non-marital share of the notes to pay this marital debt, yet by signing the agreement Husband chose to indebt both the marital and Husband's non-marital portions of the notes. So since Husband chose to handle the debt in that fashion and even tendered documents, spread sheets authorized by him that treated the debt in that fashion, this court is not going to assign the debt to just the marital portion of the notes.
>
> So subtracting the advances from the total value of the notes per [H]usband, the Court accepts and finds credible Mareta's determination that 45.95 percent of the notes or $613,511 is marital property while 54.05 percent of the notes or $721,659 is deemed Husband's non-marital property."

¶ 36     Mark argues that, as the loan obligation was a marital debt, the trial court should have offset the $680,720 entirely against the marital estate, not against any of the nonmarital assets.

Under this scheme, the court should have found $1,089,589 to be nonmarital property ($2,015,890 x 0.5405), instead of $721,659 ($2,015,890 - $680,720 x 0.5405). We disagree.

¶ 37    Throughout this case, Mark treated the $680,720 as advances against the expected payout of all of his subordinated notes. He described the transaction that way, trial exhibits demonstrated it that way, and counsel argued it that way. Mark laments that his "testimony may have been clearer had he used the word 'loans' rather than 'advances,' " yet he did use the words that he used. Further, while Mark also testified that the advances were completely separate transactions, again he had to make that statement after blaming the "misleading" schedule that "shows it as–you would think that it was an advance against the subordinated notes." The trial court heard and saw the witnesses, and we must give great deference to the court's credibility determinations; we will not disturb the trial court's factual findings unless they were against the manifest weight of the evidence. *In re Marriage of Enders*, 2015 IL App (1st) 142435, ¶ 98. The trial court was not required to believe Mark's statement that the advances were unrelated to the subordinated notes. There was abundant evidence, both documentary and testimonial, to support the trial court's finding that the advances were related to the notes and should be deducted from both the marital and the nonmarital estates. As this was not against the manifest weight of the evidence, we find no error here.

¶ 38                                                    Cross-Appeal

¶ 39    Carole cross-appeals, contending that the trial court erred in denying any contribution to her attorney fees. A trial court's decision regarding the payment of attorney fees is reviewed for an abuse of discretion. *In re Marriage of Sobieski*, 2013 IL App (2d) 111146, ¶ 37. We will find such an abuse of discretion only where the trial court acts arbitrarily, without conscientious judgment, or, in view of all of the circumstances, it exceeds the bounds of reason and ignores recognized principles of law, thereby resulting in substantial injustice. *Id.*

¶ 40    In general, attorney fees are the responsibility of the party incurring the fees. *Id.* ¶ 38. However, section 508(a) (750 ILCS 5/508(a) (West 2012)) of the Act permits a trial court to order a party to contribute to the other party's attorney fees after it considers the parties' respective financial situations. *Id.* Where contribution is sought at the end of a prejudgment proceeding, fees may be awarded in accordance with section 503(j) of the Act. See 750 ILCS 5/508(a) (West 2012). Section 503(j)(2) in turn states in relevant part that any award of contribution "shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j)(2) (West 2012). As no maintenance was awarded, we need not look beyond section 503 of the Act.

¶ 41    The section 503(d) criteria for division of marital property are: (1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or nonmarital property; (2) the dissipation of the property; (3) the value of the property of each party; (4) the marriage duration; (5) the relevant economic circumstances of each party; (6) any obligations from prior marriages; (7) any antenuptial agreements; (8) the age, health, occupation, amount, and sources of income, employability, job skills, liabilities, and needs of each party; (9) the custodial provisions for any children; (10) whether apportionment is in lieu of or in addition to maintenance; (11) the reasonable opportunity for future earning or income; and (12) the tax consequences. 750 ILCS 5/503(d) (West 2012).

¶ 42    Carole first argues that the trial court abused its discretion in light of Mark's superior financial situation. Carole was awarded 55% of a $6,500,000 marital estate, or approximately $3,575,000. She argues that the "extra" 5% that she was awarded amounts to only $325,000, which, if she pays $150,000 in attorney fees, leaves her with only $175,000, or 2.7% more than Mark, who also has an $830,000 nonmarital estate and "far superior earning power to boot." Thus, according to Carole, "by any measure used to assess financial standing under [the Act] *** Mark's financial position was far better than Carole's by the court's own analysis," and the trial court's failure to award any contribution for fees is "inexplicable."

¶ 43    The trial court stated that it reviewed "the file and the trial notes and *** all applicable factors" pertaining to the issue of contribution and found that "the property awarded to each party is large and each party was allowed to litigate this case." We cannot conclude that expecting a party to pay fees of $150,000 after being awarded $3,575,000 is arbitrary or without conscientious judgment, nor does such a decision exceed the bounds of reason and ignore recognized principles of law, thereby resulting in substantial injustice. See *Sobieski*, 2013 IL App (2d) 111146, ¶ 37.

¶ 44    Carole also argues that Mark needlessly increased the cost of litigation and thus provided another basis for his contribution to her attorney fees. Carole lists several instances of Mark's intransigence and "demonstrated bad faith," to use the trial court's words, that resulted in attorney fees of $28,800. The trial court noted many of these in its oral ruling; however, the court also noted various similar actions on Carole's part, including failing to produce certain documents, changing her position during trial and asking the court to ignore testimony of her own expert, and unnecessarily extending her own testimony. The court also noted that, while Mark "took some questionable steps during this litigation," he was never actually held in contempt. It also noted that certain of Mark's failings had been "at his own expense"; they generally affected his credibility, and his failures to tender certain documents "led this Court to conclude that the property was marital and strengthen Wife's case."

¶ 45    While Mark's actions certainly did increase the cost of litigation, Carole was not faultless in this area either. We find no abuse of discretion in the trial court's decision to let the parties pay their own attorney fees from their ample distributions.

¶ 46    For these reasons, the judgment of the circuit court of Lake County is affirmed.

¶ 47    Affirmed.