NOTICE

Decision filed 01/20/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240999-U

NO. 5-24-0999

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| CHARLOTTE A. PEARL, | ) | Piatt County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 20-D-36 |
| | ) | |
| SCOTT J. PEARL, | ) | Honorable |
| | ) | Dana C. Rhoades, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court's judgment classifying real property as nonmarital and awarding it to petitioner is affirmed where the circuit court's finding that petitioner owned the real property prior to marriage and rebutted the presumption that the real property was gifted to respondent was not against the manifest weight of the evidence.

¶ 2     Respondent, Scott J. Pearl, appeals the circuit court's judgment finding that petitioner, Charlotte A. Pearl, rebutted the presumption that real property deeded to Scott during the marriage was a gift. He also appeals the circuit court's judgment awarding the real property to Charlotte. For the following reasons, we affirm the circuit court's judgment.

1

¶ 3                                    I. BACKGROUND

¶ 4      On October 15, 2020, Charlotte, aged 77, filed a petition for dissolution of marriage after 12 years of marriage with Scott, aged 60. The petition alleged irreconcilable differences as grounds for the dissolution. The petition also alleged "chronic financial abuse" and "coercion, with the assistance of a third party," related to a property transaction that benefitted Scott. Charlotte requested that Scott pay her maintenance, and further requested the court determine all issues related to characterization and disbursement of all property and debt. Charlotte also filed a motion for exclusive possession of the residence at 999 Timberview Drive, Monticello, Illinois which was jointly held. The motion alleged that Scott had already moved out and there was an order of protection (OP) against Scott for financial abuse, which also granted her possession of the house.

¶ 5      On October 23, 2020, Scott filed a counterpetition for divorce. Therein, Scott alleged that he was without sufficient or adequate income. Scott requested that Charlotte pay him maintenance and also pay his attorney fees.

¶ 6      On October 30, 2020, the parties entered into a temporary agreement providing Charlotte with the exclusive possession of the Timberview property. The agreement also provided Scott with a date to remove his belongings from that property and further stated that the OP case was dismissed without prejudice.

¶ 7      On February 24, 2021, Scott filed a motion for summary judgment. The motion acknowledged that Charlotte currently had exclusive possession of the Timberview property but relied on a September 15, 2015, quit claim deed transferring title of the Timberview property from "Charlotte and Scott, husband and wife," to "Charlotte and Scott, as tenants by the entirety." Scott also relied on an October 29, 2015, transfer on death deed, which provided that upon the death of the surviving owner of the Timberview property, the real estate would vest equally in Scott's son

2

and Charlotte's daughter. Scott's motion for summary judgment argued there was no material fact that the parties acquired the Timberview property during their marriage and therefore it was subject to equitable division by the court.

¶ 8    On May 9, 2023, Charlotte filed a notice of intent to assert a claim for dissipation of assets. The notice alleged that Scott sold marital property and did not share the funds received from the sale. The items listed included a Kubota utility tractor ($16,000), two utility trailers ($5,400), a Lakota RV trailer ($28,240), and a riding lawn mower ($3,500). The notice also alleged that Scott received $35,000 payment from Social Security upon approval of his 2019 disability application, and $28,338 in loans from his friend/paramour, Anita Selock.

¶ 9    The dissolution proceedings occurred over six days from May 9, 2023, to August 8, 2023. The following testimony was provided. Scott testified that he was living in Cisco, Illinois, at a property owned by Anita Selock. Scott stated that Anita bought the property as a rental investment and immediately after she purchased it, Scott moved in. Scott was unemployed when he married Charlotte and later obtained employment at Kirby Hospital where he worked for about a year before he was fired. He later worked at Stoddard Farms for about two years and then went to work for Case IH as a salesman for about five years. He also drove a truck for AB AG Services. Scott asserted that he withdrew 401(k) funds amounting to between $42,000 and $45,000 between 2010 and 2015 and used it to pay bills at the house.

¶ 10   In early 2019, Scott applied for Social Security disability because he could no longer drive due to his back. Anita helped him with the disability application. He explained that Anita was their next-door neighbor who was widowed in 2015 or 2016. He agreed that after the death of her spouse, Anita began spending more time at his and Charlotte's residence. Scott's December 2020 financial affidavit included loans from his brother ($6,000), his mother ($2,000), and Anita

3

($5,538). Scott conceded that he had no written documentation regarding the loans. He testified that the Timberview property was worth $345,000 and had approximately $125,000 remaining due on a mortgage. The monthly mortgage payment was $658, which did not include taxes or insurance. He made no mortgage, insurance, or tax payments after he and Charlotte separated. Charlotte paid them.

¶ 11    Scott testified that the Kubota tractor was purchased for approximately $16,000 during the marriage and he sold the tractor. He also testified that he sold two utility trailers. He gave none of the sales proceeds to Charlotte. The parties also had an RV that Charlotte purchased. Scott "turned that over" to Anita, who then sold the trailer for $28,240. He stated that Anita gave the proceeds to Charlotte. Scott admitted selling a closed utility trailer to Anita for $2,800 and stated she had been instrumental in supporting him since he and Charlotte separated. Scott's only income was his Social Security disability, and he disputed working any jobs except that he did mow Anita's lawn and helped remodel her house in 2019. He had not done any kind of home repair or maintenance for anyone else. He agreed that his loan from Anita increased after 2020 and, as of the November 30, 2022, was now $28,338. He had no documentation regarding the increased loan from Anita.

¶ 12    Scott stated that his Social Security disability application was approved in 2021. After the approval, he received a $35,000 payment representing benefits due from the time the application was filed to the time of approval. Scott provided none of that money to Charlotte and none of that money was used to pay the mortgage, taxes, or insurance on the Timberview property.

¶ 13    Scott also testified that he traded in the lawn mower he owned with Charlotte to buy a new mower. He stated that he had a 75% interest in the new mower and Anita owned the other 25% because she paid the remaining balance due on the mower when they purchased it. He disputed having an 18-foot, enclosed work trailer but admitted pulling one behind his truck to mow a yard.

He stated that Anita owned the trailer and he had been using it for about three years. He clarified that Anita bought the trailer for him, but it was in Anita's name. Scott disputed that the trailer contained tools, or that he did any work out of that trailer, except for working on his son's porch and redoing an apartment in 2019. He stated he was the "gopher" on those jobs, did not do any labor, and only drove the trailer to the job site. He agreed that he also used the trailer for power washing, was paid for those jobs, and had a business card for "Pearl Shine" but disputed that he still owned that business. He stated that the power washing equipment was in his garage at the house owned by Anita.

¶ 14    Jeff Ensign, Sr., testified that he had known Scott since the 1990s. Jeff testified that he saw Scott performing labor at a local residence two times after January 2019. He stated Scott was driving a truck with a red trailer and was up on a ladder using his power washing equipment. The second time, Scott was on a ladder either fixing or cleaning out gutters on the garage. Both sightings occurred the previous summer which would have been in 2022.

¶ 15    Bruce Cannon testified that he was a certified real estate appraiser in Illinois and previously worked as a banker for 40 years. He completed an appraisal for the Timberview property. After discussing the high and low selling points related to the house, he appraised the property at $281,000 as of April 28, 2023. He also reviewed an appraisal performed by Mark Whitsitt in October 2022 in which Mark appraised the house at $360,000. Bruce explained the market changes during that six-month period. He also addressed the different sales comparisons, noting that Mark included homes that were newer than the Timberview property and a listed property that, as yet, had not sold.

¶ 16    Monica Hall lived behind the Timberview property and testified about jobs she saw Scott perform. She stated that in 2019, he installed downspouts and drains for the gutters on a large pole

5

barn, which also required him to dig the troughs with a shovel. She stated that Scott also delivered bales of hay and bags of feed for the barn animals in 2019 and 2020. He would stack the hay in the loft. Monica stated that she also saw Scott mowing the yard next to his property in Cisco. In July 2021 Monica observed Scott driving an end loader from the old FS plant with loads of gravel over to his residence to build a new driveway and watched him level the gravel after it was dumped. He also helped a crew put siding on his house. Monica also testified that she saw Scott walking on the recent court break for lunch and said Scott had no problem walking until he saw her; he then started to limp.

¶ 17    Rachel Davidson, a neighbor of Charlotte's, testified she also saw Scott cutting grass, weed eating, and taking care of the horses after 2019. She stated that she saw Scott with Anita at least once a week when Scott would visit her at the AG Edwards office where Anita worked. Anita's office was near Rachel's office. Rachel also identified photographs of Scott sitting on a rail, mowing grass, and pictures of Scott and Anita outside her office as well as at Anita's home. All of the photographs were taken in 2021 and 2022.

¶ 18    Charlotte's daughter, Krickett Kelley, testified that her mother worked at Kirby Hospital in 1999 and retired in May 2012. In the Spring of 2020, when Charlotte and Scott were having difficulties, Krickett would go over to her mother's house and would see that Charlotte was upset. When Krickett asked what was going on, Charlotte could not remember. Krickett stated that when Charlotte became stressed, she would black out and have difficulty remembering things. This reaction had been occurring for some time. Krickett testified that Scott was always trying to tell her that Charlotte had dementia and could not remember anything. It was Krickett's opinion that it only happened if someone was yelling at Charlotte or Charlotte was under a lot of stress. The conversations with Scott about Charlotte's dementia began in 2014. He would tell her that

Charlotte could not remember things and her memory was worsening. He was always trying to convince Krickett that Charlotte was "worse." Krickett did not agree because there were numerous times she would talk with her mother and her mother would be fine; however, when Krickett went to their house, and Scott was yelling at Charlotte, Charlotte would be distraught. There were times Krickett would tell Charlotte she was coming over but Charlotte would forget because she was upset about something else.

¶ 19    Krickett testified that she never saw Scott with any physical limitations. He baled hay and hauled feed out to the barn until he moved out of the house. He continued to take construction jobs, refinished Anita's basement, and drove to Oklahoma to pick up a horse trailer. Krickett explained that Charlotte lived in the Timberview house since the 1980s. After Scott left, Krickett helped her mother with the house and animals. They had four miniature horses, two regular horses, three dogs, and two cats. Krickett also helped mow the grass and took Charlotte to her out-of-town medical appointments and shopping for groceries.

¶ 20    Charlotte, who was 80 years old at the time of the hearing, testified that she moved into the Timberview property in 1989. She was also raised there as a child, moved away, and then came back. She identified the October 1, 1984, warranty deed from her parents to her and her husband at that time, James Corray. She also identified the April 30, 1985, deed in which James conveyed his portion of the property back to Charlotte as part of their divorce agreement. Charlotte testified that from 1985 to 2015, she never conveyed anyone an interest in that property. She stated that there was a mortgage placed on the property in 2012 that was signed by her and Scott. A copy of the $105,000 mortgage from State Bank of Bement taken against the Timberview property was placed into evidence. Charlotte testified that she did not convey any interest to Scott when that mortgage was taken. She also testified that an equity line of credit was issued by the bank in 2013

7

to her and Scott in which they obtained a $35,000 line of credit from First Financial Bank. It was secured by the Timberview property. A copy of that line-of-credit mortgage, dated February 11, 2013, was placed into evidence. Charlotte testified that she did not convey any property interest to Scott for that loan either.

¶ 21    On October 15, 2015, Charlotte and Scott took out a loan for $140,000 from the State Bank of Bement to get a better interest rate. The funds were used to pay off the remaining State Bank of Bement loan ($98,338.58) and the First Financial Bank line of credit ($29,985.65). There was no plan to convey any interest to Scott. No deeds were prepared or executed that conveyed any interest to him. The excess money from the refinancing was used to buy a hot tub.

¶ 22    Charlotte testified that things were not going well between her and Scott in 2015. She stated that his drinking and smoking became heavier and he spent many weekends away from home. He would drink a fifth of bourbon every two days and smoke two to three packs of cigarettes a day. They did not sleep together although they slept in the same room. Things got worse between 2015 and 2020. When she would get home from work, Scott would be sitting in the garage drinking with a woman. In addition to the woman, Anita would come by almost every evening.

¶ 23    Charlotte stated that she had no recall of ever conveying her property to Scott. She explained that if she had done it, she would have done it when they were first married or when she took out the first mortgage. Charlotte testified that Hugh Finson was the attorney who drew up her and Scott's wills in 2010. She did not believe that any healthcare powers of attorney were drawn up at that time. Charlotte's will allowed Scott to stay in the house until he died but if it was sold, the house proceeds would give 25% to Scott's son and 75% to Charlotte's daughter. Charlotte testified that she found a copy of the quit claim deed from her first husband to her in Scott's drawer when she was moving Scott's belongings out of the house in 2020. She stated that on the back of

8

the document, in Scott's handwriting, he wrote "house in both names, transfer on death instrument, TODI," and he drew a picture of her plot of land. A copy of the handwritten paper was placed into evidence. Charlotte had no idea how Scott obtained a copy of the prior deed. She stated that she never knowingly executed a deed conveying an interest in her property to Scott. She stated that she later found out that Scott, through Anita and her employer Edward Jones Investment, obtained an attorney named Wozniak in Champaign. Charlotte stated that she never consulted Wozniak, asked him to prepare any documents, and never went to his office. She did not even know where his office was located.

¶ 24    Charlotte testified that she and Scott argued at the Edward Jones office because she was being pressured. She stated that Scott picked her up and took her to the office. She had no idea why they were going there. She went into the office where Anita sat. They were later taken to a back room. Charlotte could not remember what the attorney said because she was already upset. Scott wanted her to sign documents, but she had never seen them before. A big argument ensued. The attorney left the room. After the attorney left, Scott threatened to leave Charlotte if she would not sign the documents. He told her that she would not be able to take care of herself or the property if he was gone. He also told her that she needed a new will because she could not find her old one. Charlotte explained that she kept her old will in a box and it had gone missing. She further explained that after she went to the Edward Jones office, her old will was back in the box where it was previously kept. She did not remember signing anything at the Edward Jones office. After Scott told her he was going to leave her, her mind went blank and she could not remember anything else about the meeting, except she thought that people came in as witnesses.

¶ 25    When Charlotte went to an attorney in 2020, she found out about the 2015 quit claim deed, the transfer on death deed, the healthcare power of attorney, and the will. She could not state

9

whether or not it was her signature on the quit claim deed because she had no memory of signing anything that day. She did not remember signing any of the other documents either. She agreed those documents were dated about six weeks after the deed, but Charlotte stated that she never went back to the Edward Jones office after the day in September. She agreed the documents were notarized by the same people who signed the will. She stated that she had no memory of ever seeing Wozniak a second time and did not remember seeing anyone sign anything. She stated that she never agreed to have the proceeds from any sale of the house split equally between their children. Charlotte also noted that Krickett's name was spelled wrong in the will and if she had seen it, she would have made them fix the document.

¶ 26    Charlotte testified that she continued to clean houses for a living. She could drive but would not drive on the interstate because it caused her to have panic attacks. She also tried to avoid driving at night. She stated that after Scott left in September 2020 he did not pay anything toward the mortgage, property taxes, or insurance. Charlotte paid them. She stated the tax payments on the house were approximately $2,000 a year. The insurance was $175 a month. She stated that Scott stopped providing any money toward the mortgage in May 2020 because he said he did not have any money. The mortgage payment was $658.33. She stated that she used $40,000 of her retirement money to build a pole barn that cost $25,000 and the rest of money just filtered away. She clarified that her retirement money was never put into the joint account. She also testified about Scott continuing to do construction work and power washing houses after he filed for Social Security disability benefits. Charlotte testified that in 2004, she added a family room onto the right side of the house and a two-car garage on the left side.

¶ 27    Attorney John Wozniak next testified. He identified a letter sent to Charlotte and Scott with draft copies of the documents he prepared. He stated that he met with Scott and Charlotte on

10

August 7, 2015, to discuss estate planning at the Edward Jones office in Monticello, Illinois. He stated that Joe Mauser, who ran that office, would refer business to him for his financial planning clients who needed an estate plan. He stated that Scott and Charlotte appeared to be of sound mind during the meeting. After hearing about their assets and how they wanted them disposed, he drafted a letter that he hand-delivered to Scott and Charlotte on September 15, 2015. He drafted a will and a healthcare power of attorney for Charlotte. He met with Charlotte on September 15, 2015, and reviewed what it said. Thereafter, he called in Joe Mauser and Anita to witness Charlotte and Scott signing their documents. He recalled Charlotte signing her name freely and voluntarily. He did not question Charlotte's capacity to transfer real estate or sign the healthcare power of attorney. He stated that Scott and Charlotte returned to the Edward Jones office on October 29, 2015, and signed the transfer on death deed. He did not question Charlotte's mental capacity at that time either. Wozniak's file contained an estate planning personal information fact finder form. The form indicated that the first meeting was on April 16, 2015, and Wozniak's comments stated, "Don't know if have will—will check w/Finson & get back w/ me may want TODI." A second meeting was held on July 21, 2015, and the notes stated, "do TODI, POAs, Will, Q.C.D." A third meeting set for August 18, 2015, was to review and finalize the documents but it was canceled. A fourth meeting was held on September 15, 2015, to "sign" the documents. Wozniak believed that Charlotte was at all the meetings, but he could not state anything specific from the meetings. The only email address listed on the fact-finder form was Scott's email. He recalled Scott as being a large man with a cowboy hat and boots. He could not recall anything about Charlotte and did not know if her leg was in a cast at any of the meetings.

¶ 28　　Mark Whitsitt testified that he performed an appraisal on the Timberview property on October 31, 2022. He testified that the value at that time was $360,000. He believed the real estate

11

market in Piatt County and Champaign County was stable or increasing in the time period since the appraisal was made. He agreed that the difference between his appraisal and that by Bruce were the comparable sales used by the parties. Mark agreed that he used homes with three or four bedrooms as comparables while the Timberview home only had two bedrooms. He disputed that a room with no closet was not a bedroom. He also used newer construction homes for comparison, while the Timberview property was built in 1953.

¶ 29 Jeremiah Pearl, Scott's son, testified that Scott and Charlotte lived at the Timberview property from the time of their marriage in 2008 until September 2020. He stated that there had been no difference in his father's activity level from 2008 to the present. His father had not done any work for him in the last three or four years although he was there to supervise while Jeremiah worked. Jeremiah built a deck on his current house a month before the hearing and Scott supervised and gave Jeremiah advice on what he should be doing. Jeremiah did not see his father do anything strenuous in the last three or four years. He believed his father's movements were slower and he would grimace a lot more now than he would previously. He agreed that he loved his father and would like to help his dad in any way he could.

¶ 30 Anita Selock testified that she had known Scott and Charlotte for 24 years. She lived in the house behind theirs and their backyards bordered each other. She lived there for two years and continued to have contact with both Charlotte and Scott after she moved in 1998. She was the senior branch office administrator at the Edward Jones office in Monticello and primarily performed administrative duties. The office would occasionally use John Wozniak to prepare estate planning documents for Edward Jones's clients. They had used him since the summer of 2013. She believed that Scott and Charlotte met with Wozniak at her office and began speaking

12

with Wozniak in the Spring of 2015. She stated that Charlotte asked her about Wozniak's competency.

¶ 31 Anita was present when Scott and Charlotte signed the documents on September 15, 2015, and she believed Charlotte freely and voluntarily signed the documents. She also recalled Charlotte signing documents on October 29, 2015. She did not think that Charlotte's mental acuity had changed in the 23 years she knew her but said Charlotte was not happy for the last 5 years.

¶ 32 Anita testified that she and Scott were just friends and they had never dated. She provided him with financial assistance and stated that the funds she provided Scott were "to be loans." She could not recall if she had written any checks to Scott since June 21, 2021. She stated that she was providing Scott with housing by allowing him to occupy one of her properties in Cisco. The rent was currently being added to the loan balance which was around $30,000. She stated that they had a "gentleman's agreement." The rent, which included utilities was $950 a month and he lived there beginning in either April or May 2021. She stated that buying the house in Cisco was a good investment for her and she was friends with Scott, so it seemed "logical that he could help me with the property." She explained that he "house sits" on occasion and if she had tradesmen that needed to come to the house to fix something, Scott would let them into the house and would supervise them.

¶ 33 Anita testified that her husband passed away on June 20, 2018. She agreed that Scott had an account at Edward Jones that he opened around 2010. She did not believe Charlotte had any accounts there. Scott's account was closed around 2012. Scott would visit her at the Edward Jones office about once a week. He also helped with remodeling her house. She helped him purchase a lawn mower and paid the $1,100 balance after the trade in of Scott and Charlotte's old mower. Anita purchased the house that Scott lived in for $79,900 as an investment. As of the date of the

13

hearing, he had paid $1,200 in rent. She agreed that she visited Scott at the house every night. Anita agreed that she wrote Scott numerous checks, most of them for $1,000 or more, but did not recall why she gave him the money or for what he used it. Anita wrote checks to Scott from March 18, 2020, through June 21, 2021, that totaled $20,200. She agreed there was no loan documentation to support the "loan" that was written in some of the memo sections on the checks. Anita confirmed that Scott was not paying rent on the house that he was living in and that she paid the utilities, taxes, and insurance for the investment property. Anita stated that she currently owned three parcels of real estate: the one she lived in, the one Scott lived in, and one in Florida that her son lived in. Anita also agreed that she bought Scott the red enclosed trailer that he pulls behind his truck on July 7, 2020. She stated that she loaned him the money to get the trailer but admitted there was no documentation for that loan either.

¶ 34    Scott was recalled and testified that he was currently unemployed. He left the Timberview property because an order of protection was taken against him that required him to leave. He stated that he stopped working as a truck driver because his back pain made it difficult to drive. He contributed to the expenses at Timberview while he was working by paying $1,600 to $1,800 monthly. When he stopped working, he quit paying. He stopped working in December 2018. He applied for disability in early 2019. He was approved on April 6, 2021. He received a lump sum payment in 2021 in the amount of $35,786. He received $1,928.30 monthly thereafter until it was increased to $2,114. He addressed his physical maladies and the medical treatment he received for them.

¶ 35    Scott took the lawn mower he and Charlotte owned and traded it in for a zero-turn mower. Anita paid the difference between the trade-in value and cost of the zero-turn mower. He sold the Kubota tractor for $16,000. He disputed lifting hay bales in 2020 and explained that the $35,000

14

from Social Security was used to pay off his credit cards and other debt, including a check to Anita for $11,000. He and Charlotte talked about the property transfer deed a few days before the mortgage was signed. He stated that the deed was necessary to ensure "that I was going to be covered for putting my name on a large sum of money that I had been paying into for a number of years anyway without protection." He wanted the property to be in his name if there "was a default of any kind." He stated that Charlotte understood that he needed to be protected too. He stated that the transfer on death document was to protect themselves and the children. Scott testified that Anita usually left their visits between 8 p.m. and 10 p.m., unless they were watching a movie which could last until 10:30 p.m.

¶ 36 Charlotte was recalled as a witness. She stated that she had only known Anita for eight years. She did not meet Anita when they were neighbors. She eventually met her through Scott. Charlotte disputed ever discussing estate planning with Anita. She had no conversations with Anita when the documents were signed. Anita came to their house two or three times a week after Anita's husband died. She would say that she was working on Scott's computer. Charlotte stated that Anita helped Scott with his disability application. Charlotte disputed that Scott was disabled. Following Charlotte's testimony and the submission of evidence, respondent rested.

¶ 37 The parties submitted written closing argument. Scott's argument contended that the court's previous order allowing Charlotte to make a claim for dissipation was erroneous, because the notice was untimely. He further argued that the equity in the Timberview property, amounting to $241,500.94 should be split. Scott requested 60% of the equity in the Timberview property.

¶ 38 Charlotte's closing argument contended the property was nonmarital because the property had been in her family for over 100 years, her first husband deeded the property back to her when they were divorced, and she was the sole owner of the property when she and Scott married. The

15

argument contended that the deeds were initiated by Anita, that Charlotte had dementia, and was unaware of what she was signing in 2015. It further argued that the attorney who prepared the deeds had no memory of Charlotte ever being there and conducted no inquiry as to her memory at the time the deeds were allegedly executed. The remainder of the closing argument addressed the dissipated assets, listed the equity in the home at $162,500.94, and further claimed that Scott was receiving income from gainful employment, his disability claim was specious, and he was concealing his self-employment income.

¶ 39   On November 9, 2023, the court issued a memorandum order on the petition for dissolution of marriage and allocation of marital and nonmarital assets and debts. The order found that irreconcilable differences were proven and dissolved the marriage. The court noted that the docket entry allowing for filing notices of intent to claim dissipation should have stated December 9, 2022, instead of December 9, 2023, and issued an order *nunc pro tunc* changing that date. The order found that Charlotte's claim of dissipation was filed after the court's deadline and therefore, the court denied Charlotte's claim for dissipation.

¶ 40   As to the Timberview property, the court noted that Charlotte owned the residence prior to the parties' marriage, the parties resided there during the marriage, and the property was in Charlotte's family for many decades. It noted that the property was previously placed in Charlotte and her initial spouse's names, but he deeded his interest back following their divorce and Charlotte did not transfer any interest to Scott when they initially married. The court also noted that the deed to Scott occurred in conjunction with the parties obtaining a refinanced mortgage.

¶ 41   The court addressed the conflicting testimony as to whether Charlotte intended to gift the property to Scott as well as the lawyer's testimony and that provided by Anita. The court ultimately found that the September 2015 quit claim deed was to serve as security for Scott to reduce his

16

exposure resulting from the $140,000 bank note. Therefore, the court found that Charlotte had no donative intent to gift the property to Scott, that she rebutted the presumption that the property was marital, and classified the Timberview property as Charlotte's nonmarital property. Given the court's determination on the property, it also found that the transfer on death deed was null and void.

¶ 42    The court declined to address the validity of Scott's disability award but ultimately declined to order either party to pay spousal support. The parties were ordered to pay their own attorney fees, and the remaining order disbursed the motor vehicles (and debt related thereto), financial accounts, and remaining personal property. Charlotte's counsel was to prepare a judgment of dissolution.

¶ 43    On August 22, 2024, a judgment of dissolution of marriage was filed, which incorporated the circuit court's November 9, 2023, memorandum order. Scott timely appealed.

¶ 44                                II. ANALYSIS

¶ 45    On appeal, Scott argues that the circuit court erred in finding that the Timberview property was Charlotte's nonmarital property and awarding it to her. He relies on the September 2015 quit claim deed transferring the property to him and Charlotte as tenants by the entirety and the October 2015 transfer on death deed. He also claims the circuit court erroneously applied a preponderance of the evidence standard instead of the clear and convincing standard.

¶ 46    The disposition of property is governed by section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503 (West 2022)). "Before a court may distribute property upon the dissolution of a marriage, it must first classify the property as either marital or nonmarital." *In re Marriage of Faber*, 2016 IL App (2d) 131083, ¶ 3. We review the circuit court's classification of an asset as either marital or nonmarital under the manifest weight of the evidence

17

standard. *In re Marriage of Wendt*, 2013 IL App (1st) 123261, ¶ 15. "[A] decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the evidence." *In re Marriage of Faber*, 2016 IL App (2d) 131083, ¶ 3 (citing *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44).

¶ 47    Marital property includes all property, debts and other obligations acquired by either spouse subsequent to the marriage other than those listed as exceptions by statute. 750 ILCS 5/503(a) (West 2022). Here, although Scott initially contended that the property was acquired by the parties after they were married, the evidence revealed that the property was long held by Charlotte's family and Charlotte owned the property, solely in her own name, prior to her marriage to Scott. The record contains the conveyance from Charlotte's parents, Walter and Melissa Denison, to James and Charlotte Corray, as joint tenants with the right of survivorship, on October 1, 1984. Following the Corray divorce, on April 30, 1985, James Corray conveyed his rights in the Timberview property to Charlotte.

¶ 48    The next conveyance is the September 15, 2015, quit claim deed which lists the grantors as "Charlotte A. Corray now Charlotte A. Pearl and Scott J. Pearl, husband and wife" to Charlotte A. Pearl and Scott J. Pearl, husband and wife" as "tenants by the entirety." We note, however, no deed was submitted with either Charlotte A. Corray or Charlotte A. Pearl conveying an interest in property to Scott that would allow him to be properly classified as a grantor in the September 15, 2015, deed. Nor is there any record of what interest Scott acquired in the property prior to the September 15, 2015, conveyance.

¶ 49    Regardless, we first consider the statute addressing marital and nonmarital property. See 750 ILCS 5/503 (West 2022). All property, including debts and other obligations, acquired by

18

either spouse subsequent to the marriage is considered marital property unless a statutory exception applies. *Id.* § 503(a). The exceptions include, "property acquired by gift, legacy or descent," "property obtained by judgment awarded to a spouse from the other spouse," and "property acquired before the marriage, except as it relates to retirement plans." *Id.* §§ 503(a)(1), (5)-(6). The latter property is considered nonmarital property. *Id.* Given the testimony and deeds submitted at the hearing, there is no evidence to contradict the conclusion that the Timberlake property was nonmarital property at the time of Scott and Charlotte's marriage in 2008.

¶ 50    The statute further states that all property acquired by either spouse after the marriage and before dissolution is presumed marital property. *Id.* § 503(b)(1). "This presumption includes non-marital property transferred into some form of co-ownership between the spouses, regardless of whether title is held individually or by the spouses in some form of co-ownership." *Id.*; see also, *In re Marriage of Rink*, 136 Ill. App. 3d 252, 257 (1985) ("The placing of title to non-marital property in joint tenancy with a spouse raises a presumption that a gift was made to the marital estate and the property becomes marital property.").

¶ 51    Although there is no evidence as to what conveyance occurred that allowed Scott to be classified as a "grantor" prior to executing the September 15, 2015, deed, the evidence revealed that Scott and Charlotte conveyed interest to themselves on that date as tenants by the entirety. The classification of "tenants by the entirety" is provided by statute and is limited to spouses. See 735 ILCS 5/12-112 (West 2022). It "operates under the fictional assumption that a husband and wife are one for legal purposes—it conveys the property to them as one person" and "each own 100% of the property." *In re Estate of Aryeh*, 2021 IL App (1st) 192418, ¶ 36. The statute provides an exemption for property held in a tenancy by the entirety from being sold to satisfy the debt of only one spouse, which protects an innocent spouse from "losing the marital home because of the

19

individual debts of his or her spouse." *Id.* ¶ 37. Here, because there is a deed transferring the Timberview property to both parties during the marriage, there is a presumption that the real property was transmuted into marital property, which raises a presumption that a gift was made to the marital estate. *In re Marriage of Rink*, 136 Ill. App. 3d at 257; see also, *In re Marriage of Olsen*, 96 Ill. 2d 432, 439 (1983).

¶ 52 However, "[t]he presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (a)" of section 503(b)(1) of the Act. 750 ILCS 5/503(b)(1) (West 2022). To successfully rebut the presumption of gift and apply the exception of section 503(a)(1), the donor spouse must present "clear, convincing and unmistakable evidence" that there was no donative intent. *In re Marriage of Rink*, 136 Ill. App. 3d at 257. Factors considered in determining whether the presumption was "overcome include the making of improvements, the payment of taxes and mortgages, the occupancy of the premises as a home or business and the extent of control and management of the property" (see *In re Marriage of Hunter*, 223 Ill. App. 3d 947, 952 (1992)) or whether the conveyance was made to avoid potential liability. *Coates v. Coates*, 64 Ill. App. 3d 914, 918 (1978).

¶ 53 As noted above, the trial court found that the Timberview property was Charlotte's nonmarital property and that the September 2015 quit claim deed was to serve as security for Scott to reduce his exposure resulting from the $140,000 bank note. As to the factors, the court noted that Charlotte improved the Timberview property with an additional room and two-car garage prior to the marriage. The trial court also noted that the deed was not mentioned in Wozniak's correspondence with the estate documents, that Anita could not recall what documents she transmitted to Wozniak at Scott's request, and that Krickett's name was misspelled in the documents. Ultimately, the court found that Charlotte had no donative intent to gift the

20

Timberview property to Scott. We review the court's decision under the manifest weight of the evidence standard. See *In re Marriage of Schmitt*, 391 Ill. App. 3d 1010, 1018 (2009).

¶ 54     As to the factor addressing the improvements, the trial court noted Charlotte's testimony that revealed an additional room and a two-car garage were added to the property in 2004, which was four years before she married Scott. Additionally, Charlotte testified that she built a second pole-barn on the property in 2012 solely using her retirement money that was never deposited into the joint account. The only other addition to the property was a hot tub in 2015 which was installed using the left-over money from the 2015 consolidation loan. Here, the improvements to the property rebut a presumption that Charlotte intended to gift the property to the marital estate.

¶ 55     The second factor is the payment of taxes and mortgages. Scott and Charlotte married in 2008. Charlotte testified that in 2010 they opened a joint account to pay the common bills. However, there was no evidence of any mortgage on the property until April 2012. Scott stopped working in December 2018 and applied for disability in early 2019. It was undisputed that he made no additional payments toward the mortgage, taxes, or insurance after May 2020 when he could no longer borrow enough money to deposit into the joint account. Despite both Scott and Charlotte being signatories on the mortgage, only Charlotte made payments on the mortgage, taxes, and insurance after May 2020. Here, while it appears that the parties shared the expenses from 2012 to 2020, Charlotte used her own funds to pay all the house expenses from 2008 to 2012 and again from May 2020 to August 2023. We further note that even after Scott received $35,000 from Social Security in 2021, and over $20,000 from Anita from 2020 to 2021, no offer to reimburse Charlotte for any payments made after he left, or to assist with payments in the future, was ever made. These facts, in conjunction with the factor addressing mortgage and tax payments, rebut a presumption that Timberview was marital property.

21

¶ 56    The third factor is whether the occupancy was used as a home or a business. Here, there was no evidence that the home was ever used as a business. Charlotte first lived on the property as a child and was deeded the property during her first marriage. She continued to live on the property after her divorce in 1985 and continued to reside on the property as of August 8, 2023, the last day of trial. The parties were married in 2008, and it would appear that Scott lived on the property until the OP was issued requiring his departure in September 2020. The OP was dismissed without prejudice in October 2020. However, Scott did not return to the property and instead moved into a property owned by Anita where his rent was $950 a month. Further evidence revealed that Scott only paid $1,200 in rent to Anita from 2020 to 2023. As such, we hold that the occupancy as a home factor weighs in favor of rebutting the presumption that the Timberview property was a gift to the marital estate.

¶ 57    The fourth factor is the exercise of control and management of the property. The testimony as to these factors was limited. There was no testimony as to control of the property except for Charlotte obtaining an OP to have Scott removed in September 2020. As to the management of the property, the evidence revealed that Scott cut the grass and took care of the livestock and pets residing on the property. Accordingly, we hold that the control and management of the property factor did not rebut the presumption that the Timberview property was a gift to the marital estate.

¶ 58    Finally, the last factor concerns the purpose of avoiding potential legal problems or liability. Here, Scott's testimony confirmed that the underlying reason his name was put on the quit claim deed was to ensure that he was protected as a signatory to the mortgage. However, he made no payment toward that same mortgage from 2020 to 2023. Therefore, this factor also rebuts the presumption of a gift. *Coates*, 64 Ill. App. 3d at 917 ("[A] conveyance of an interest in realty [that] was made to avoid potential liability is indicative that the conveyance was not a gift.").

Considering the factors *in toto* we cannot find that the circuit court's finding that Charlotte rebutted the presumption of a marital estate gift was against the manifest weight of the evidence.

¶ 59    Scott also contends that the circuit court erred in using the wrong standard to analyze the evidence. He claims that the circuit court relied on a preponderance of the evidence standard instead of the clear and convincing evidence standard. Scott is correct in stating that clear and convincing evidence is required to rebut a presumption of a gift to a marital estate. *In re Marriage of Rogers*, 85 Ill. 2d 217, 221-23 (1981). However, he is incorrect in claiming that the trial court used a preponderance of the evidence standard. The trial court's order set forth the clear and convincing evidence standard on page six and the words preponderance of evidence are not found within that order.

¶ 60    Instead, it appears Scott is relying on the court's consideration of the "totality of the evidence" in reaching its conclusion. We find no merit in Scott's argument. Notably, Scott's brief fails to follow the Illinois Supreme Court Rules. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Argument "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." *Id.* Only one citation to the record is found in Scott's entire argument section. Further, and more specifically here, no citation of authority is presented in support of his contention that "totality of the evidence" is an evidentiary standard. Our review of the circuit court order interprets the phrase simply as clarification by the circuit court that it reviewed all of the evidence before determining that Charlotte produced clear and convincing evidence that the conveyance was not a marital gift.

¶ 61    Scott also argues that the circuit court "cited two cases in support of its decision" namely, *Coates*, 64 Ill. App. 3d 914 (1978) and *In re Marriage of McBride*, 2013 IL App (1st) 112255. He contends the cases "are not applicable to the case at bar" and further contends this case is more

analogous to *In re Marriage of Johns*, 311 Ill. App. 3d 699 (2000). We again disagree. The court's citations to *Coates* and *McBride* were for the principles of law regarding the gift presumption, the burden of proof for rebuttal, the evidentiary standard, and the factors considered to determine whether the presumption of a gift was overcome. At no time did the circuit court analyze the facts in either *Coates* or *McBride* with the facts in the case at bar. Further, the principles of law cited by the circuit court from *Coates* and *McBride* are also found in *Johns*. See *Johns*, 311 Ill. App. 3d at 702-03. Accordingly, we find this argument is equally without merit.

¶ 62    Finally, Scott argues that the fair market value of the Timberview property was $360,000,[1] and the balance on the mortgage at the time of the hearing, was $118,449.06, leaving equity of $241,500.94. Scott states that consideration of the factors should lead this court to jointly award the Timberview property to the parties "with each party receiving equal equity of $120,750.47." Notably, Scott's brief does not address the factors that require consideration set forth in *Coates*, *McBride*, or *Johns*. Instead, he simply argues that this case is similar to *Johns* and therefore, the court erred in finding the Timberview property was nonmarital and awarding it to Charlotte. We again disagree.

¶ 63    The factors for consideration are set forth and discussed above. We need not repeat the analysis except to state that our review of the evidence does not show that Charlotte failed to rebut the presumption by clear and convincing evidence that the Timberview property was not a gift. As

---

[1]Scott's brief relies solely on the appraisal of his expert, Mark Whitsett. As noted above, Charlotte's expert, Bruce Cannon valued the property at $281,000. No determination as to the actual value of the property was made after the property was found to be nonmarital. However, the circuit court did assign all indebtedness on the property to Charlotte and found, citing *In re Marriage of Crook*, 211 Ill. 2d 437 (2004), that the marital estate was not entitled to reimbursement because it enjoyed the use of Charlotte's nonmarital property. Neither of those findings were raised as issues on appeal and therefore no further discussion is necessary.

such, we cannot find that the circuit court's classification of the property as nonmarital was against the manifest weight of the evidence.

¶ 64    Scott also requests one-half of the equity in the Timberview property. Review of the circuit court's distribution of property is an altogether different issue with an independent standard of review. The distribution of marital property is statutory and stems from the circuit court's review of statutory factors. See 750 ILCS 5/503(d) (West 2022). "[D]istribution of marital property lie[s] within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion." *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 661 (2008). "The question is not whether we agree with the [circuit] court but rather whether the [circuit] court acted arbitrarily without the employment of conscientious judgment or, in view of all circumstances, exceeded the bounds of reason so that no reasonable person would take the view adopted by the [circuit] court." *In re Marriage of Siddens*, 225 Ill. App. 3d 496, 500 (1992).

¶ 65    Here, however, we found that the Timberview property was properly classified as nonmarital property and therefore, Charlotte was entitled to receive her own nonmarital property. *In re Marriage of Werries*, 247 Ill. App. 3d 639, 649 (1993). No argument was presented as to any other asset distributed in the judgment. Because the circuit court's finding of nonmarital property was not against the manifest weight of the evidence, we affirm the finding and hold that Scott's argument requesting $120,750.47 in equity is moot. We note, however, that even if this court were to classify Scott's argument as one requesting reimbursement to the marital estate, we would find the argument was forfeited due to Scott's failure to present any argument on this issue in his brief. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited."). Accordingly, we affirm the circuit court's finding that the Timberview property was nonmarital property and the judgment awarding said property to Charlotte.

¶ 66                                    CONCLUSION

¶ 67    For the above-stated reasons, we affirm the circuit court's judgment finding that the Timberview property was nonmarital property and awarding the property to Charlotte.


¶ 68    Affirmed.